## LAWLER *v.* SKELTON et al.

No. 41855 May 22, 1961 130 So. 2d 565.

*P. J. Townsend, Jr.,* Drew; *Watkins & Eager,* Jackson, for appellant.

*Cooper & Allen,* Indianola, for appellees V. A. Johnson and W. T. Skelton.

*Neill, Clark & Townsend,* Indianola, for appellee J. L. Turk.

ETHRIDGE, J.

This case involves issues of liability for personal injuries allegedly resulting from aerial crop spraying of agricultural insecticides. We hold that the verdict of the jury for the defendants, except one of them, is against the overwheming weight of the evidence, and accordingly reverse and remand the case for a new trial.

This suit was instituted in the Circuit Court of Sunflower County by appellant, Charles Lawler, against the defendant-appellees, W. T. Skelton, J. L. Turk and V. A. Johnson. Lawler was manager of a cotton gin, The Marie Gin Company, a corporation, whose site adjoined Marie Plantation, and was surrounded on three sides by

the plantation, which was owned by defendant V. A. Johnson. In February 1956, Johnson leased the plantation to W. T. Skelton, another defendant. The nature and effect of this contract is an issue and will be discussed subsequently, but, since we have concluded that it was a lease, creating between Johnson and Skelton a landlord and tenant relationship, it will be referred to in that way.

In August 1956 Skelton made arrangements with defendant J. L. Turk, operating the Turk Flying Service, to spray with insecticides by airplane the cotton fields of Marie Plantation. Turk employed a pilot, John P. Martin, to do the spraying. Martin used Turk's landing strip a few miles away. Skelton, who contracted with Turk to do the spraying for seventy-five cents an acre, purchased the insecticides for that purpose, and furnished the labor to mix them and to load them on the airplane. One of the chemicals used was malathion, a phosphate base poison less toxic than the other two chemicals, but highly toxic to humans. Another ingredient used was endrin, a chlorinated hydrocarbon compound. It is described as a ''potent poison'' thirty to forty times more toxic than DDT. The solvent xylene is a petroleum hydrocarbon poison. Approximately seventy per cent of both the endrin and malathion was xylene or, as to malathion, some other petroleum base solvent. Two gallons of the endrin and malathion mixtures were combined with eight gallons of water to compose the liquid sprayed on the cotton. It is undisputed that, if a person receives an excessive amount of these chemicals, they can be highly toxic and dangerous to human life.

On the north side of the gin was an uncovered gin platform, on which Lawler was working on a morning in August 1956. Lawler says it was August 16. He was welding some steel beams and wearing gloves and a helmet with an opening in the top. A Negro man, Johnny McCaleb, was helping him. Lawler had been advised earlier by Skelton that he was going to have the cotton

sprayed, and Lawler told him that he would be through with the welding in about forty-five minutes. In the meantime, Martin, the pilot, was spraying the cotton north and west of the gin building by traversing the field in his airplane on an east and west pattern. The cotton grew close to the gin platform, not more than twenty to thirty feet away from it. Martin's bi-plane had eighteen nozzles protruding from the back of the wings, from which he was spraying under pump pressure the cotton at a rate of two gallons of the mixture per acre.

The pilot was in the process of doing some trimming work on the edge of the field north and west of the gin platform, by flying several rounds going north and south. Plaintiff and McCaleb testified, without any substantial dispute, that at that time plaintiff was welding in a squatting position between a steel beam and a brace. The pilot cut his motor off and floated to the left and west close over the gin platform. McCaleb saw the plane coming in low over them, and cried out to Lawler. The pilot suddenly started his motor and pulled up, opening the valves immediately over the gin platform, upon which the spray from the airplane covered plaintiff's back and neck and came through the top of the helmet, wetting his face thoroughly. The mixture went into his mouth, nose and throat. He strangled and had difficulty getting his breath. Mcaleb helped Lawler remove his helmet and assisting in wiping the liquid from his face. Testimony by Lawler and Mcaleb as to these facts is not materially contradicted. The pilot did not remember the incident, although he admitted flying over the platform sometime during the job.

Prior to this incident, Lawler was in apparent good health, except that he had a mild chronic emphysema. This fact was established by the testimony of his personal physician for several years before the accident, and by other doctors, including lung specialists. The only con-

tradiction of this was by appellees' witness, Dr. W. A. Hull, to whose testimony later reference will be made.

Immediately after he was sprayed with the chemical mixture, plaintiff became dizzy and nauseated, but worked some that afternoon. That night he was quite ill, but, wearing the same clothes, he went back to work the next morning for several hours, after which his fever went up and he fell into a coma. He was hospitalized by Dr. Aden for several days. In subsequent months he suffered various illnesses, about which no further comment will be made, since it was an issue for the jury as to whether these later illnesses were the result of plaintiff's being sprayed.

The great weight of the evidence is to the effect that plaintiff was sprayed with this toxic chemical mixture in excessive quantities. The testimony by him and Mc-Caleb is not really contradicted. It is also undisputed that a human being who receives through his nose, mouth and skin an excessive quantity of these poisons will very probably become ill from them and in many instances his life will be endangered. The labels on the containers for both endrin and malathion reflect that they are poisons dangerous to humans by skin contact, inhalation or swallowing. The manufacturers, by the labels, cautioned users and other persons exposed to them. The "Safety Manual for Aerial Applicators", published by the Mississippi Aeronautics Commission, the Civil Aeronautics Administration, and the Mississippi Aerial Applicators Association, directs pilots who are flying and spraying with these chemicals to comply with numerous precautions, and states that they are extremely hazardous if inhaled, absorbed through the skin, or swallowed. In short, the great weight of the evidence established the fact that appellant was sprayed with a large quantity of these chemicals, and that they are dangerous to human beings when absorbed in excessive quantities.

There was a factual issue as to whether this incident of appellant's being sprayed was the proximate cause of his immediate acute illness, although the great weight of the evidence is that it was. Witnesses for appellant, and some for appellees, testified on a hypothetical question that, if appellant were sprayed with a large quantity of this mixture, it probably caused his acute illness. On the other hand, Dr. Hull testified that he thought the spraying had no relation to plaintiff's acute illness. He examined certain X-rays of plaintiff's chest taken before and after the spraying, and concluded that before the accident plaintiff had chronic pulmonary emphysema, bronchitis and pleurisy. Dr. Aden thought that plaintiff's acute illness was pneumonia. He did not recall plaintiff's telling him of the spraying incident on August 16. The hospital record, however, reflects that on August 17 he prescribed atropine, the recognized antidote for chemical poisoning. The court erroneously refused to permit plaintiff to testify that he heard his wife tell Dr. Aden he had been sprayed the day before. This was error, since the issue was not whether it was true, but whether it was said. The fact that the statement was made was a fact relevant to whether Dr. Aden was so notified. Handshoe v. Daly, 211 Miss. 189, 51 So. 2d 230 (1951); 31 C. J. S., Evidence, Sec. 239.

There was also some dispute as to whether Martin was doing the spraying on the date alleged by plaintiff, August 16, or whether it was several days before. Dr. Hull's testimony is considerably weakened by his admissions on cross-examination that plaintiff's symptoms were characteristic of chemical poisoning; a mild emphysema can be aggravated by an excessive dose of insecticides; and these insecticides are dangerous if there is enough exposure. Moreover, the hypothetical question to him contains several erroneous assumptions, including statements as to prior shortness of breath, the use of oxygen, and that Lawler was given no atropine by

Dr. Aden. Hull further said that plaintiff "could have been taking his pneumonia at the time he was dusted." This was pure conjecture on his part.

With further reference to causation, defendant used testimony by the county extension agent and several Delta farmers of many years experience in spraying their cotton with substantially similar mixtures of economic poisons. They stated they had seen field hands and others sprayed with such mixtures, had never observed anyone injured thereby, and, from their observations and experience, they did not think the spraying of cotton fields in the prescribed and usual manner was dangerous to human beings. Appellant complains of the admission of this testimony, asserting there was no similarity of circumstances and conditions. It is argued that it should have been excluded under the rule of "res inter alios", etc. We have carefully considered this question, and think there was shown a sufficient similarity of circumstances and conditions to warrant the admission of this evidence, for whatever probative value it might have on the issue of whether the spraying of plaintiff was a proximate cause of his acute illness. See Jackson County v. Meaut, 181 Miss. 282, 179 So. 343 (1938); 32 C. J. S., Evidence, Secs. 448, p. 85; 455, 458. The trial court has ample discretion in determining whether such proffered evidence meets the prerequisite of substantial similarity of conditions, and in controlling the use and number of such witnesses. We cannot say it abused its discretion. Ibid., Secs. 458, 449. In rebuttal, plaintiff asked Dr. Hogan, who had practiced in the Delta, as to whether she had treated patients whose illnesses were in her opinion attributable to cotton poisoning. The trial court erroneously sustained an objection to this, since the inquiry was proper on rebuttal, and would have tended to contradict defendants' witnesses.

In summary, the issue of liability contains two factors, (1) whether plaintiff was sprayed by Turk with

a chemical mixture, and (2) whether the spraying was a proximate cause of his acute illness. The above analysis renders it manifest that the verdict of the jury against plaintiff on liability of appellee Turk was against the overwhelming weight of the evidence.

 ██ The same conclusion applies to the liability of appellee Skelton. Assuming but not deciding that Turk was an independent contractor, these actions by Turk were nondelegable duties of Skelton, the lessee of the lands whose cotton crop was being sprayed. Farmers and all horticulturists have the right to use the many beneficial new dusts and sprays to protect their growing crops from insects and diseases, but such preventive measures cannot be used with absolute impunity. Due care must be exercised in the operation, and an owner or lessee of land may be liable in damages for spreading poisonous dusts and sprays negligently. ██ The owner of the premises may not delegate the work of dusting or spraying a crop with poisonous insecticides to an independent contractor and thus avoid liability. Anno., Liability for Injury Consequent upon Spraying or Dusting of Crops, 12 A. L. R. 2d 436, 440 (1950). The cited annotation refers to a number of cases so holding. To the same effect are Heeb v. Prysock, 219 Ark. 899, 245 S. W. 2d 577 (1952); McKennon v. Jones, 219 Ark. 671, 244 S. W. 2d 138 (1951); Crouse v. Wilbur-Ellis Co., 77 Ariz. 359, 272 P. 2d 352 (1954); see also Pitchfork Land & Cattle Co. v. King, 335 S. W. 2d 624, (Tex. Civ. App. 1960); Fair Lbr. Co. v. Weems, 196 Miss. 201, 16 So. 2d 770, 151 A. L. R. 631 (1944); Ness Creameries v. Barthes, 170 Miss. 865, 155 So. 222 (1934); 57 C. J. S., Master and Servant, Sec. 590, p. 362; Prosser, Torts (1955), Sec. 64, p. 360.

With general reference to the liability of persons using airplanes for the purpose of spraying or dusting crops, 6 Am. Jur., Aviation, Sec. 44, summarizes the rule: ''Spraying or Dusting.—Persons operating or em-

ploying airplanes for the purpose of spraying or dusting crops or other vegetation must use due care to perform such operations under such conditions and in such manner as not to cause injury to others. Liability has been incurred in several instances for injuries resulting from the spreading or drifting of the spraying or dusting materials onto adjacent premises.''

See also Anno., Exterminator's Liability for Personal Injury or Death, 73 A. L. R. 2d 1155 (1960); Note, Crop Dusting: Legal Problems in a New Industry, 6 Stanford L. Rev. 69 (1953); Note, Liability for Chemical Damage from Aerial Crop Dusting, 43 Minn. L. Rev. 531 (1959). Mississippi has a statute regulating the application of any hormone type of herbicide applied by aircraft for the purpose of killing weeds in a crop. Miss. Laws 1952, Ch. 169, being Miss. Code 1942, Rec., Secs. 5000-21 to 5000-23. This act does not apply to aerial application of insecticides. See also Mississippi Economic Poisons Act of 1950, Miss. Laws 1950, Ch. 452, being Miss. Code 1942, Rec., Secs. 5000-01 to 5000-13.

The remaining question is whether there can be any liability upon Johnson, owner of the plantation, who leased it to Skelton. Appellant contends they were joint adventurers or partners. Johnson leased the land to Skelton, using a printed lease form, which provided that Johnson would receive 25 per cent of the cotton and cottonseed raised, and certain percentages of soybeans, oats and wheat. The lessor retained certain residual rights of control over the crop operation, in the event of mismanagement by lessee. At the same time the lease was executed, Skelton executed to Johnson a note and deed of trust for $16,000, secured by the crops, and machinery and equipment owned by Skelton. During the crop year Johnson advanced the money thus loaned, when and as Skelton needed it. The lease expressly provided that the parties were landlord and tenant, were not partners, and the tenant had no authority to bind

the landlord. Since Johnson was entitled to one-fourth of the cotton as rent, he paid one-fourth of the cost of insecticides to be applied on the crop. However, Skelton selected the crop poisons, employed the pilot, and borrowed the money to pay him. Skelton owned the equipment on the leased premises, hired the farmhands, and managed the farming operation. Under all of the circumstances, we conclude there was no joint adventure or partnership between Johnson and Skelton as to the farming of the land. Johnson simply leased the plantation to Skelton under traditional methods for such operations. The fact that these parties for several years had a joint venture in the raising and selling of cattle on the place is separable from the lease. It does not change the status of the parties as to the cotton operation, which was that of landlord and tenant. Hence the judgment of the trial court for Johnson will be affirmed.

In summary, the judgment in favor of Turk and Skelton is reversed, because it is against the overhelming weight of the evidence, and the cause is remanded for a new trial as to them. The judgment of the trial court is affirmed in part, as to appellee Johnson. The cross-appeals of Johnson and Skelton, complaining of instructions stating they were joint adventurers, is moot and is dismissed.

On direct appeal, affirmed in part, as to judgment in favor of V. A. Johnson; otherwise reversed and remanded; cross-appeals are dismissed.

*Lee, P.J.,* and *Kyle, Arrington* and *Rodgers, JJ.,* concur.