COUNCIL *v.* DUPREL, et al., d.b.a. MARQUIS FLYING SERVICE

No. 42949 June 8, 1964 165 So. 2d 134

*Wynn, Hafter, Lake & Tindall,* Greenville, for appellant.

*Keady, Campbell & DeLong,* Greenville, for appellees.

BRADY, TOM P., J.

Appellant, Harold T. Council, filed his original declaration in the Circuit Court of Washington County, Mississippi, on October 27, 1961, against appellees, C. A. Duprel, and J. P. Marquis and Mrs. J. P. Marquis, d/b/a Marquis Flying Service, for damages to appellant's cotton and bean crops grown in the year 1961, caused by a hormone type herbicide coming into contact with the crops.

In the original declaration, appellant charged that appellees' negligent aerial application of the herbicide to Appellee Duprel's rice crop had caused the appellant to lose 265 bales of cotton from his 1961 crop, for which he demanded damages in the amount of $45,182.50. Appellant did not claim any damages to his soybeans.

On December 7, 1961, appellant amended his declaration by charging that the negligence of the appellee also had severely damaged 300 acres of his 1961 soybean crop, resulting in the loss of 6,000 bushels of soybeans, for which he demanded additional damages of $15,000, increasing his total demand for damages to $60,182.50.

On January 23, 1962, appellant amended his declaration a second time, charging that the negligence of appellees had severely damaged 729 acres of his 1961 bean crop, causing him to lose 13,415.44 bushels of soybeans, for which he demanded damages of $25,489.34, thereby making his final total demand for damages $70,671.84.

Before the suit was tried, it was dismissed as to Mrs. J. P. Marquis. First trial of the case began at the June, 1962 term of court of Washington County, which lasted for four days and which ended in a mistrial. At the regular December, 1962 term of court it was tried again and the jury returned a verdict for the appellees and judgment was entered accordingly. From this judgment this appeal is prosecuted.

After the appeal was perfected, Appellee J. P. Marquis died and his widow, Mrs. Ada F. Marquis, was

appointed administratrix of his estate. A reviver was had against the administratrix by order in this cause by the Supreme Court of Mississippi.

While the administratrix of the estate of J. P. Marquis is one of the two appellees, for convenience and for clarity, both appellant and appellee in their briefs use the term appellees to refer to C. A. Duprel and J. P. Marquis, the original defendants below. We will, therefore, in this opinion likewise, when using the term appellees, refer to C. A. Duprel and J. P. Marquis.

The testimony in this case consumes seven large volumes exceeding 800 pages. There are 91 numbered exhibits, several of which are collective, so that all the maps, documents, records and photographs introduced in evidence exceed 100 in number. The trial was excessive, prolix, and burdened with minute detail. In order to shorten this opinion within reasonable limits, we will deal with only those pertinent facts which we feel are appropriate and necessary in order that the basic issues can be resolved. Though the facts are complicated, the vital issues are comparatively simple.

The appellant, in the year 1961 and for several years prior thereto, owned and farmed lands located approximately three miles south of the city of Greenville, Washington County, Mississippi. He was a cotton and soybean farmer. His lands are divided into two parts by Mississippi Highway No. 1 running North and South so that longitudinally they vary in depth from one and a half to two miles, while latitudinally they are approximately two miles in width. Considerable detail as to the physical relationship of appellant's and appellee Duprel's land is necessary at this time in order that the parties to this suit can follow this opinion.

Appellee, C. A. Duprel, was in 1961 the owner of lands lying immediately east of and adjacent to the lands owned by appellant. He was a rice and soybean grower. The east boundaries of appellant's lands con-

stituted, in some instances, the west boundaries of appellee Duprel's land so that on the north boundary of both properties there were common boundary lines extending approximately one and onehalf miles to the south. Appellee Duprel's lands extended north and south for a total distance of three and one-half miles. The physical relationship of the cotton, rice and soybean crops in 1961 is geographically shown on Exhibit P-1, which is a map of the land of appellee Duprel, and Exhibit P-7, which is a map of the land of appellant Council. On this Exhibit P-7 will be found the cuts or tracts of land upon which appellant grew soybeans in 1961, shown in red crayon. Without maps it is extremely difficult to visualize the relevant tracts. The cuts of appellant's cotton claimed to have been damaged in 1961 are outlined with green crayon and the other cuts of cotton are outlined with blue crayon. Each cotton cut of the appellant bore a number inside of a circle. Appellee Duprel's map likewise had three colors, red, green and yellow, which appear on Exhibit P-1. There were four tracts containing rice in 1961 which are colored solidly in red and numbered in black crayon as 1, 2, 3 and 4. Those tracts or cuts containing soybeans of the appellee in 1961 are colored solidly in green. The two tracts leased to appellee Duprel's tenant, one Charles W. Roden, are solid yellow. The solid green soybean cuts (Roden's) are numbered in blue crayon from 1 through 21, and each number is circled in the same blue crayon. Some difficulty is experienced in keeping separate and distinct the various cuts of appellant and appellee. Both maps, Exhibits P-1 and P-7, are drawn on the same scale, i. e., one inch equals 660 feet, or eight inches equals one mile. The land rented by C. W. Roden from appellee Duprel is situated on the south end of Duprel's property and approximately two miles from appellant's nearest land. During the year 1961 Roden planted cotton on said rented lands in two tracts of 31 acres and 77

acres, respectively. The appellant in 1961 operated these lands known as Cedar Land Farms, which consisted of 1,968 acres and which formed a crude rectangle about two and one-half miles east and west at its maximum width and about two miles deep north and south at its maximum depth. This tract is bordered on the north by what is known as the V. F. W. Road and on the south by another country road known as the Wilcox Road. It is bordered on the west by old Highway No. 1, while on the east its borders are irregular for a distance of one and one-half miles south from the V. F. W. Road with the lands of appellee Duprel, whose lands extend south another two miles. Mississippi State Highway No. 1 (new Highway No. 1) runs north and south through appellant's land so that its maximum width west of Highway No. 1 is one mile, and east of said highway is one and one-half miles, fronting on the east side of Highway No. 1, and within the northern and southern boundaries of appellant's lands are Greenville Golf and Country Club and a residential subdivision known as Cloverdale Addition. In 1961 appellee Duprel operated the land known as Homewood Farms, consisting of 2,200 acres. Except in the southeast corner, where it widens in an east and west direction to one and one-half miles, the land is in the shape of a rectangle three and one-half miles long from north to south and one mile wide from east to west. It is bounded on the north by the V. F. W. Road, on the west for the north one and one-half miles by appellant's land, and thereafter by the lands of others. On the south it is bounded by the land of another rice farmer, one Milton Richard, and on the east by a ditch and the land of other farmers.

Appellee Duprel in 1961 had 320 acres planted in rice. This acreage was divided into four separate tracts. Tract 1, comprising 84 acres in the N½ of Sec. 8, ran from north to south one-half mile in length, extending from appellee Duprel's north boundary. The west boundary

of this rice field adjoined the east boundary of appellant's land. Immediately south of this rice field appellee Duprel had a field of beans running one-half mile north and south. Tract 2 of rice consisted of 174 acres located in the E½ of Sec. 15, one mile long from north to south. This tract was immediately south of the bean tract mentioned above. That is, the northern boundary was one mile south of the northern boundary of appellee's land, and it extended one-half mile east and west and ran in length one mile in a northern and southern direction. This rice field cornered at its northwest corner with the southeast corner of one tract of land owned by the appellant and was one-half mile distant and due east of the east boundary of another of appellant's fields. Tract 3 of appellee's rice consisted of approximately 30 acres located in the northwest corner of Sec. 27, immediately east of the lands owned by appellee Duprel and rented to C. W. Roden and planted in cotton by Roden in 1961. Tract 4 of appellee's rice consisted of 32 acres, which was located in the southwest corner of the NW¼ of Sec. 15, and this rice field was immediately adjacent to appellant's land upon which soybeans were planted in 1961. Appellant planted, in 1961, twenty-four separate cuts or fields of cotton. Eight cuts lay east of Highway No. 1 and the remaining cuts were west of Highway No. 1. Three of the cuts located east of the highway lay north of what is described as the Country Club property, and five cuts lay south of the Country Club property. Each of the four cuts of appellee's rice was virtually surrounded by appellee Duprel's twenty-one cuts of soybeans, comprising approximately 920 acres. The record shows that there were no rice growers other than appellee Duprel in 1961 in an area within approximately two miles of appellant's farm lands. Appellant's farm lands east of Highway No. 1 contained approximately 154.83 acres, and the other

sixteen cuts west of Highway No. 1 contained approximately 384 acres.

In 1961 the appellant planted 24 separate cuts or fields of cotton. Eight cuts lay east of Highway No. 1 and the remaining cuts were west of Highway No. 1. Three of the cuts east of Highway No. 1 lay north, and five cuts lay south of the aforesaid Country Club property. Appellant's cotton land, 8 cuts, east of Highway No. 1 contained approximately 154.83 acres. The other 16 cuts west of Highway No. 1 contained approximately 384 acres.

On July 3rd and 4th, 1961, appellee Duprel had appellee Marquis spray by airplane almost all of his rice lands with chemical hormone type herbicide commonly known as 2-4-5-T. On July 3rd Marquis sprayed Tract 1 and part of Tract 2. On July 4th he sprayed the rest of Tract 2, and Tract 3. On July 22nd, he sprayed Tract 4.

Appellant, in his assignment of errors, lists six grounds which are practically the same grounds urged also as errors committed by the trial court in overruling appellant's motion for a new trial. These errors are: 1. Appellant was entitled to a peremptory instruction for damages. 2. The verdict of the jury is against the overwhelming weight of evidence and the court should have, because of this, granted a new trial. 3. The court erred in granting appellees' Instruction No. 5, which is discussed later. 4. The court erred in admitting, over appellant's objection, the testimony of E. D. Robinson which was read from the record of the first trial of this cause in June of 1962. 5. The court erred in admitting, over appellant's objections, Exhibits D-25 and D-27 to the testimony of appellees' witness, Stewart W. Turner. 6. The trial court erred in overruling appellant's motion for a new trial on each of the other grounds specified in the motion for a new trial.

Since the first error assigned deals with the question of whether or not the appellant was entitled to a peremptory instruction, we will, in considering this question, outline the pertinent testimony offered by the appellant and appellees which is relevant in deciding all factual questions.

The appellant in urging that he was entitled to a peremptory instruction asserts, in substance, that by looking solely at the testimony offered in behalf of appellee and the material facts which are undisputed, he is entitled to the peremptory instruction; that the only two witnesses by whom the appellees sought to prove that there was no damage admitted that there was at least some damage, or "slight damage".

Appellant testified that about 6:30 A. M. on the morning of July 4, 1961, there was a wind blowing out of the east, and that he estimated the wind velocity to be from ten to twelve miles per hour; that between 7:30 and 8:00 o'clock on the same morning appellant went to town for breakfast and that sometime after 8:00 o'clock he saw the airplane being flown by appellee Marquis over Duprel's rice tracts and he could notice a drift of spray from an east to west direction and that the spray admittedly was a solution containing the 2-4-5-T, which drifted onto and heavily damaged appellant's cotton and soybean crops. The record indicates that this chemical herbicide, used for the purpose of killing coffee weeds and other broad leaf weeds in rice, can be injurious to cotton.

Appellant contends it was the negligent manner in which the spray was emitted from the aircraft which was being flown by the appellee, Marquis, while he was flying at a greater height than was necessary and when turning or clearing obstacles and while doing so he failed to cut the spray off, and he did so under wind conditions existing at that time which caused the spray to drift upon the appellant's crops of cotton and soy-

beans. Proof offered by the appellant is to the effect that the soybeans and the cotton crops in the various cuts were seriously affected. In appellant's brief, however, the appellant in substance concedes that because his records had not been properly kept in the previous years and were insufficient to make a clear presentation, and because soybeans were more tolerant to 2-4-5-T than cotton, that he was not able to establish conclusive damage resulting to the soybeans because of the application of the 2-4-5-T concentrations complained of in the first and the second amended declarations. It appears, therefore, from the brief of the appellant that no contention or demand is now being made because of any damage alleged to have been done or which could not be proved to have been done to his soybean crop. It is to the appellant's cotton crop that the damage is largely claimed. Appellant's proof is to the effect that the fourteen cuts of cotton containing 292 acres, on which there was damage, produced on an average of 361.29 pounds of lint per acre, while on the ten undamaged cuts there was produced 761.86 pounds of lint per acre, or that there was a loss of 400.57 pounds of lint cotton per acre, with a comparable loss of yield in cottonseed. Of the 24 separate cuts of cotton, as heretofore stated, eight lay east of Highway No. 1, and the remaining cuts were west of Highway No. 1. Translated into bales of cotton, the appellant claims that he has sustained a loss of 265 bales of cotton, which at an average of 32½¢ per pound for lint cotton amounts to $43,062.50, and that the seed of said cotton so lost to the appellant would have a value, above the cost of ginning, of $8 per bale, making a total damage to appellant in the amount of $45,182.50 because of the loss which he sustained in his cotton production caused by the application of the herbicides used by the appellee.

The appellant urges that there are only two issues presented in the case: (a) The origin of the

2-4-5-T which affected appellant's cotton crop; and (b) whether there was any damage therefrom. As to (a), the first of these issues, the appellant urges that the evidence was not susceptible of any reasonable conclusion as to probability other than the 2-4-5-T which spread over appellant's crop came from a negligent application of this dangerous and volatile herbicide by appellee Marquis to appellee Duprel's rice crops. Likewise, insofar as the second issue is concerned, the appellant urges the evidence produced is not susceptible to any reasonable conclusion as to the probability of damages to appellant's crops other than *at least some damage* was done entitling appellant to recover. Appellant urges therefore that the trial court erred in not granting appellant a directed verdict as to liability. In support of the contention of the appellant, witnesses William Bell, Dan Guravich, the photographer, James Berry, John W. Kirk, John Fulcher, D. A. Whitfield, and Dr. R. A. Frans testified in behalf of the appellant. The record discloses that these witnesses testified that there was evidence of damage to the soybean crop and to the cotton cuts of the appellant. The testimony of these witnesses varied in weight and in amount insofar as the damage is concerned. These witnesses likewise testified as to a drift pattern which the insecticide seemed to have laid down across the cotton cuts of the appellant. It is the contention of the appellant that there are actually no material facts in this case respecting negligence or damage which are disputed, while the appellee maintains, to the contrary, that there are really no material facts in the case respecting negligence or damage which are not in dispute. Appellant, in support of his contention, considers the testimony of his eight witnesses, together with the sixty odd numbered exhibits which the appellant introduced in evidence. The appellant also earnestly urges that there is no evidence of probative value on either

the issue of liability or the issue of damages which supports the jury verdict which was rendered for the appellees, and that therefore the lower court erred in not granting a directed verdict for the appellant at the conclusion of the appellee's testimony. Therefore, it is incumbent upon this court to determine whether or not the evidence presented in the case is sufficient to raise material issues of fact for consideration by the jury. These factual issues relate to the elements of negligence and the elements of damages asserted by the appellant to be present in this case.

The appellee points out that insofar as the negligent spraying of the rice fields of the appellee by appellee Marquis is concerned, it rests solely upon the testimony of the appellant alone. It was only the appellant who testified insofar as the manner in which the aircraft was being operated on the morning of July 4th is concerned. It was on that date the specific acts of negligence are charged to have taken place. It is from the appellant only that the time of the spraying is fixed and the specific tracts of rice sprayed are designated, the time of day at which the spraying took place, the height at which the airplane was being flown, the wind conditions at the time the spraying was taking place, the drift, if any; all of these vital matters were testified to solely by the appellant and the record discloses that each of these vital essentials was directly and flatly contradicted by the testimony of both the appellees.

Appellants soybean and cotton cuts were intermingled. Appellant concedes that his records for soybeans were not sufficiently kept in the prior years and that it is not easy to show any damage to the soybeans resulting from the 2-4-5-T concentrations thereon. The record discloses that all of the field reports of the appellant were kept by his Negro foreman, Elliott Wells, whose picture appears in Vol. 3, p. 261 of the record, in Exhibits P-24 and P-27. It was this witness who the

appellant testified was one hundred per cent familiar with the appellant's 1961 crops. In passing, we simply note that this witness never testified and his only presence in the record is indicated by the photographs and by statements which were made concerning his ability by the appellant. Appellant's witnesses, John Fulcher, County Agent of Washington County, and Dr. R. A. Frans of the University of Arkansas, together with both appellees and their witness, L. B. Davis, Inspector of the Mississippi State Plant Board, testified that it was lawful in 1961 to apply 2-4-5-T by aircraft provided the following requirements were met: (1) The pilot was licensed; (2) the aircraft and its equipment were inspected and approved by the State Plant Board; (3) notice of intention was filed with the local county agent's office; (4) afterwards, a report of application was sent to the State Plant Board at Starkville; (5) the wind velocity did not exceed five miles per hour at the time of the application; (6) the rate of application was not less than five gallons per acre; and (7) the height at which the spray was released above the crops sprayed did not exceed ten feet.

There is no issue that the appellee Marquis was an experienced and licensed pilot who, in 1961, had sprayed 8,000 acres of rice in Washington County, including that of Richard Walton, adjoining the appellee Duprel on the south. It is likewise undisputed that in 1961 L. B. Davis, the State Plant Board Inspector, as part of his official duties, inspected and approved the aircraft and its equipment used in the spraying operations. The notice of intention to spray appears as Exhibit P-3 of the record and the reports of the application made by Marquis likewise appear as Exhibits P-4 and P-5 of the record (pp. 204 and 209).

The only testimony in the record to indicate that the aerial application of the herbicide to the rice of appellee Duprel was negligently performed came from

the appellant, who gave an alleged eye witness account. The negligence embodied in his account was to the effect that there was a wind velocity of around seven miles per hour at the time of the application, that the application was taking place around nine o'clock in the morning, and the negligent height at which the application was being dropped when the airplane made its turns. The appellant furthermore finally admits that all but thirty-two acres of Duprel's rice was sprayed on the mornings of July 3rd and July 4th, the other rice being sprayed on July 22nd. This is in conflict with appellant's original testimony, that he saw the aircraft spraying each of appellee Duprel's four rice tracts on July 4th. On page four of the brief, the appellant states that there is a conflict only as to whether the remaining thirty-two acres of rice was sprayed on July 4th or July 22nd. The appellant, however, introduced in evidence the report of the application made on July 22, 1961, which was filed with the State Plant Board by the appellee Marquis. The record indicates that before the appellant testified he introduced in evidence the testimony of one John H. Echols, the record of wind direction and velocity readings taken by the Southern Airways at the Greenville Municipal Airport on July 3, 1961, a distance of two and a half to three miles northeast of the Duprel rice farm.

After appellant had testified in his own behalf, he introduced in evidence again through the testimony of John H. Echols a similar record for July 4th and July 22nd. These records show the following wind conditions:

"July 3, 1961

"6:30 A. M. — Calm

"7:45 A. M. — Wind from North at Six Knots

"8:45 A. M. through 12:45 P. M. — Calm

"July 4, 1961

"6:45 A. M. — Calm

"8:45 A. M. — Wind from the East at Seven Knots
"July 22, 1961
"6:00 A. M. — Calm
"6:45 A. M. — Calm"

Apparently, therefore, from the records introduced by the appellant, it appears that there was no wind from the east at the Greenville Municipal Airport during the morning of July 3, 1961. It is also apparent that there was no wind during the morning of July 22, 1961, prior to 6:45 A. M., at which time the brief spraying operation performed on that date had been completed. It does appear that a 8:45 A. M. on July 4, 1961, at the Greenville Municipal Airport the wind was blowing from the east at a velocity of seven knots or eight miles per hour. By the appellant's own proof, therefore, it appears that he has confined the alleged negligence to the morning of July 4, 1961, and to substantiate this wind velocity on the morning of July 4th, the appellant sought to establish the negligent spraying operations on that specific morning and he testified in detail respecting the time of day at which such spraying was performed, stating the various tracts of rice in which the spraying operations were flown that day, the wind direction and velocity and the management of the aircraft while emitting the spray. The appellant testified that he began his day around 5:45 A. M.; that when he arrived at the tractor shed on his place between 6:00 and 6:30 A. M. he first noticed the wind was blowing from the east at about five miles per hour and the spray was drifting to the west. At 6:30 he noticed that the aircraft was spraying Duprel's bottom cut of rice, that is, rice tract number three. A little later the aircraft was spraying the westernmost cut of rice, the thirty-two acre cut of rice in tract number four. It was when he left his car at the bridge around 7:00 A. M. he noticed that the aircraft was spraying rice tract number four. On cross-examination he testified that

at 6:30 A. M. the aircraft was spraying the rice in Tract 2, and a little later, at 7:00 A. M., it was spraying the rice in Tract 4, or the thirty-two acre cut, and that after 8:00 o'clock the aircraft was spraying Duprel's north rice field, or Tract 1, which is traversed diagonally by power lines and supported by double poles, as shown in the photographs. After returning from breakfast, appellant testified, the wind was blowing slightly out of the north, mostly from east to west, at ten to twelve miles per hour, and that he stood at the intersection of the VFW road and the north side of the gravel road and that the aircraft was then spraying rice in the north rice field, or Tract 1, and that it flew over the power lines and power poles some forty feet or more high; its spray was not cut off, and "you could see the spray mist drifting to the west."

The appellant on cross-examination admitted that at the first trial of this cause he did not testify that he saw the aircraft spraying the rice after 9:00 A. M. on that morning. He admitted that in his testimony at the first trial he made no mention of any wind blowing prior to 8:00 o'clock on the morning of July 4, 1961. Thus it was the appellant alone who offered the only testimony in the case that on July 4th the appellee sprayed all four of the Duprel rice fields; that the aircraft was flown improperly and the spray was not cut off while going over obstacles such as power lines and power poles; that the wind was blowing as early as 6:00 to 6:30 A. M.; that it was blowing at the rate of approximately eight miles per hour from the east at or about 8:00 A. M. and was still blowing when the aircraft was still operating in the rice fields after 9:00 A. M.. Each of the appellees, both as adverse witness and in his own behalf, squarely contradicted all of the foregoing testimony given by the appellant with respect to the wind, the manner in which the aircraft cleared obstacles, the time of the wind and its direction and

velocity, as well as the particular area of rice sprayed on July 4th. Appellee Marquis testified he had a wind gage on his truck at the airstrip and was also burning rubber tires for the purpose of letting the smoke serve as a wind indicator. Marquis further testified that he sprayed portions of Duprel's rice on July 3rd, 4th and the 22nd; that on July 3rd he sprayed the northern-most rice field, or Tract 1, consisting of 84 acres, and in addition he sprayed approximately 15 to 25 acres of rice in Tract 2. The spraying operations began on July 3rd between 4:30 and 4:45 A. M. and terminated between 7:30 and 8:00 A. M. He estimated that on July 3rd he sprayed approximately 100 to 110 acres of rice. He testified that on July 3rd at the beginning of the spraying operations it was calm, with no wind at all, but that by the time he quit there was a little breeze which came up while he was spraying; Duprel flagged him from the road, and the spraying was stopped. On examination by his own counsel, appellee Marquis testified that on July 3rd he sprayed rice in Tract 1 and a part of Tract 2, and on July 4th he sprayed Tract 3 after finishing Tract 2, and on July 22nd he sprayed Tract 4. Appellee Duprel testified that in 1961 he had three hundred and twenty acres of rice and that appellee Marquis sprayed 280 acres thereof, for which Duprel paid him at the rate of $2 per acre. Duprel testified that the spraying was performed on the mornings of July 3rd and 4th, and a small amount early in the morning of July 22nd. Duprel testified that on July 3rd there was no wind until around 7:30, "when we quit", and that on July 4th there was no wind at all until about the time they shut down the spraying operations; there was no wind out of the east during the spraying operations on either July 3rd or the 4th. Appellee Marquis testified that on the morning of July 4th the spraying operations began between 4:30 and 4:45 and were terminated between 7:30 and

8:00. On that day he sprayed a little more rice, probably fifteen to twenty acres more, than he had on the previous day. He testified that on July 4th the wind was calm until shortly before the spraying operations were completed, when there was very little variable wind which was not out of the east and was not enough to count. He testified that on the 4th he repeated the spraying of rice in Tract 2, the mile long strip, and also sprayed Tract 3, but on July 4th he sprayed none of the rice which lay north of Tract 2. He stated flatly that he sprayed no portion of the rice in Tract 1 on July 4th. He stated that he did not spray Tract 4 on July 3rd or 4th because the rice appearing in that tract was too young to spray. He denied that he was spraying as late as 9:00 A. M. that morning, but stated that on July 4th he quit spraying before 8:00 A. M., or about 7:30. Duprel furthermore testified that on July 4th there was no wind early in the morning; that a slight wind arose around 7:30, just about the time they were finishing.

Appellee Marquis testified that in spraying the Duprel rice in Tract 1 he flew under the power lines which were supported on poles approximately forty feet high, except where the poles were, and then he went over them but he cut his spray off back in the field before he started to pull up over the wires. He testified that when he came to obstacles such as woods, when making his turns he first cut his spray off back in the field. It is apparent, therefore, that on the issues of negligence outlined above there is direct and irreconcilable conflict between the testimony of appellant and that of the appellees relating to (1) the wind conditions on the morning of July 4th, 1961; (2) the areas of rice sprayed that morning; (3) the manner in which the spraying operations were each flown, particularly 1 and 3, a crucial factor in the issue of negligence. The appellant's testimony furthermore is conflicting in that he says

that the wind was blowing east at five miles per hour between 6:00 and 6:30 A. M., while the Southern Airways record showed there was no wind at the municipal airport at 6:45 A. M. on July 4th, which record the appellant introduced in evidence as his exhibit.

We have held consistently that it is solely within the province of the jury to resolve vital evidentiary conflicts on issues of negligence. These were vital evidentiary conflicts for determination by the jury. There is furthermore conflict with reference to the drift theory advanced by the appellant. Mr. Guravich, the expert photographer, and not an expert in the field of agriculture, including harmone type herbicides, nevertheless testified that some fields showed more symptoms than others, but that the heaviest were on the east, and that the further west one went the lighter the symptoms became, the symptoms being the results of the herbicide upon the cotton.

The record discloses that Guravich had never actually gone out in the fields and conducted an investigation of this type. Guravich testified on cross-examination that he stated at the first trial of the case he had testified with respect to the symptoms that the patterns were so unusual, but that on the first trial he should not have used the descriptions or patterns that were so unusual because the skipping around of the symptoms is characteristic of hormone herbicides and this is true even though the substance is borne by wind blowing from east to west.

James W. Berry, a farmer, testified that the symptoms were more evident to the east. D. A. Whitfield, who checked appellant's cotton crop weekly for insect activity from June 25th to September 25th, stated that on July 12th he noticed what he termed 2,4-D damage. He testified that seventeen of the cotton cuts of the appellant were affected but that three had grown out of it; that the early symptoms were east of the highway

and that in his opinion the source of the herbicide was from the east. John Fulcher, the agricultural agent for Washington County, likewise viewed appellant's crops and testified that he came at appellant's request on July 21st and 22nd and on August 9th. He testified, however, that he found symptoms in all fields, to a certain extent; that the early symptoms were south of Cloverdale Addition, but that the symptoms were scattered all over the entire crop; that usually he could find a drift pattern but that he could not definitely find that there was a drift pattern in this case. Furthermore, when asked by appellant's counsel whether or not he had an opinion as to the direction from which material came in this case, witness Fulcher replied, ''I couldn't say definitely.'' Fulcher furthermore stated that he had asked L. B. Davis, the representative of the Mississippi State Plant Board, who had more experience with this type case than anyone who Mr. Fulcher knew, to examine the appellant's cotton crop with him, and they found herbicide symptoms on the cotton crops of several other farmers at least a mile west of appellant's land. L. B. Davis, who was invited to examine appellant's cotton crop by the county agent and who had had ten years experience involving 250 to 300 such cases in the Mississippi Delta where hormone herbicides application by aircraft had been made, testified that symptoms of herbicide on cotton were fairly uniform throughout the crop. He testified further that Mr. Fulcher found the same thing three-quarters of a mile west of appellant's land and north of his land; that the symptoms were practically the same in all these areas. Mr. Davis testified further that if there is drift, you usually find the heaviest closest to the source of it, and the lighter as you go away from it, but in this case there was no indication of a drift. He stated positively that it wasn't any heavier in one area than in another; that there was no difference you could tell

between appellant's cotton west and east of Highway No. 1. Mr. Davis discussed this matter with appellant and testified that he told the appellant that he didn't think it came from the rice fields, that is, the rice fields of appellee Duprel. On that point he said, "I didn't think that it did because the symptoms were not heavy enough close to the rice fields to have drifted all the way across the cotton that the herbicide covered." In other words, for it to drift for a mile or a mile and a half it would have to be extremely heavy on one side in order to reach the other side and still show symptoms; he didn't think it was enough to worry about anyway. On examining various photographs and other exhibits placed in evidence by the appellant, this witness Davis testified that he had not changed the foregoing opinion expressed by him to the appellant.

Stewart W. Turner, a consulting agronomist of fourteen years experience, including three years with effective hormone herbicides on crops in the Mississippi Delta, from an examination of data supplied by the appellant in his answers to the interrogatories propounded to him by the appellees, prepared charts and they were introduced in evidence as Exhibits D-25, D-26 and D-27. Chart D-27 demonstrated that cotton cut 4 north of the country club, shown on Exhibit P-7, although 1155 feet nearer to Tract 1 of Duprel's rice than cotton cuts 5 and 6, produced more cotton in 1961 than did cuts 5 and 6. The same thing is true with respect to cotton cuts 7A and 8 south of Cloverdale Addition and also with respect to cotton cuts 12A and 13 west of Highway No. 1. Cut 7A, 1320 feet closer to the Duprel rice than cut 8, produced a higher yield of cotton in 1961 than did cut 8. Cut 12A, 726 feet closer to the Duprel rice tract than 13, produced a much higher yield of cotton in 1961 than did cut 13. The same relationship exists between 9A and 15; between 9A and 13; 14 and 15; 14 and 13; 12A and 15; 4 and 13; 5-6 and 13; 19 and 18.

(Exhibit D-25, R. 727, and Exhibit D-27, R. 736). These charted comparisons, appellee urges, refuted the appellant's theory that the herbicide drifted onto his cotton and soybeans from Duprel's land because of the wind blowing from east to west, and are wholly inconsistent with appellant's attempts to prove that the symptoms in his cotton were heaviest to the east and lighter to the west. Again we point out this is conflicting evidence. It was pertinent to the appellant's drift theory which was presented to the jury and it presented a question of fact to be resolved by the jury as part of the issues of negligence charged against the appellees.

Turning to the issue of damages, it will suffice to say that the evidence is equally as conflicting as it is on the issue of negligence. While the appellant may not have actually conceded that the appellee was entitled to an instruction insofar as damages to the soybeans are concerned, nevertheless in his brief the appellant substantially abandons claim for damages to his soybeans. As a matter of fact, the record of the appellant insofar as damage to soybeans is concerned is very weak. Elliott Wells, his Negro foreman, never testified. It was Elliott Wells who kept field notes in a notebook he carried and which he turned over to Mrs. Copeland. It was from this notebook that all of the soybeans and the cotton reports were to be found. Insofar as the soybeans were concerned, Elliott Wells counted the hoppers of beans combined and thus determined the number of bushels and he put this record down in his notebook. Unfortunately the notebook got wet and he could not make "heads nor tails" of it. The record insofar as the cotton harvest of 1961 is concerned was kept by putting the cotton harvested from each cut in a separate trailer. These trailers were hauled to the gin by Elliott Wells, and later, sometime on the next day, after the cotton from the trailer had been ginner, either Elliott Wells or the appellant mark-

ed on the gin ticket the cut from which the cotton came, and returned the gin ticket to appellant's bookkeeper, Mrs. Copeland. Thus in the case of the cotton harvest, as well as the soybeans, Elliott Wells was the central link between the field and the harvest record, so that the harvest records cannot be considered any more reliable than was Elliott Wells' notebook. The testimony of the appellant concerning the soybeans is very inconsistent and is in dispute since the appellant took some nine or ten different positions with reference to his loss from soybeans, starting with no loss at all of soybeans and then going from 6,000 bushels lost to 13,000 odd bushels to 20,000 odd bushels, back to 16,000, up to 17,000, down to 15,000, down to 12,000, up to 13,000, and down to 10,000 bushels. When compared with the production of beans from Duprel's land situated adjacent or close to the land of the appellant, we find again striking contrasts or conflicting evidence which the jury alone could resolve.

Insofar as the damage to the cotton is concerned, the appellant offered testimony, of himself and of several witnesses, that the herbicide affected the fruiting of his cotton crop, caused dwarfing of the plants and resulted in "fishhook bolls" which failed to open. The appellant, his witnesses, Dan Guravich, the photographer, D. A. Whitfield, and John W. Kirk, all testified that the fruiting of the cotton was affected. On the contrary, L. B. Davis, the representative of the Mississippi Plant Board, testified that the fruiting didn't seem to be affected. Appellant and Mr. Guravich testified there was dwarfing or stunting of the cotton plant. L. B. Davis, the State Plant Board inspector, testified he saw no dwarfing of the cotton plants in the appellant's fields. Appellant and his witnesses placed great emphasis on the fact that the "fishhook bolls" which would not open resulted throughout the allegedly damaged cotton. A photograph appearing in the record as Exhibit P-30,

showing a single cotton boll held in the thumb and fore-finger of appellant's left hand, was exhibited as evidence of this condition. In rebuttal testimony the appellant's expert from the University of Arkansas, Dr. R. A. Frans, who never saw appellant's cotton crop, testified flatly from an examination of Exhibit P-30 that the cotton boll depicted was a typical fishhook or hooked peak boll, a symptom of hormone like compounds and not the result of the insect injury. In contrast, L. B. Davis, the representative of the State Plant Board, testified that when he examined appellant's cotton crop in August and in late September he found no abnormal bolls. When questioned on cross-examination concerning the boll shown in Exhibit P-30, Mr. Davis stated that the boll depicted did not look like the result of hormone herbicide damage; it looked typically of a boll that had been insect damaged on one side, on the under side, with probably a fungus getting in the resulting cracks on the boll and causing it to fail to grow. Stewart W. Turner, the consulting agronomist, called by the appellee Marquis to examine appellant's crop in late September, testified that in his examination of appellant's cotton he found no boll malformation that could be attributed to herbicides. Thus the evidence presented to the jury as to (a) whether the fruiting of the appellant's cotton crop was affected by herbicide, (b) whether the cotton plants were dwarfed or stunted by the herbicide, and (c) whether there was a malformation of bolls so as to prevent them from opening was squarely in conflict with testimony for the appellant, and presented an issue of fact for determination by the jury. It is interesting to note that in spite of all the testimony offered by the appellant respecting the "fishhook bolls", not a single purported example was exhibited to the jury, the nearest thing thereto being the one disputed boll pictured in Exhibit P-30. Witness D. A. Whitfield, who walked through appellant's

cotton crop weekly during the summer of 1961, from June until September, as shown by his report of insect activity and recommendations for poisoning introduced in Exhibit P-4 of the record, pointed out on cross-examination that there was a very heavy weevil infestation in appellant's cotton crop throughout the season. In his final report on September 25th, witness Whitfield concluded by saying he hoped the crop would prove satisfactory, which is somewhat in contrast to the testimony of this witness who stated that at least fourteen of the cuts were suffering ill effects from the herbicide.

James Berry, farmer, testified for appellant, and said he thought the crop was damaged and he imagined he knew it would be affected. John W. Kirk testified for the appellant that although he went into only two areas, he did not know how much the crop was affected. The State Plant Board representative, L. B. Davis, testified with respect to the question of damage to the cotton, that he told the appellant he didn't think it was enough on it to worry about anyway and that there was not sufficient herbicide on the cotton to cause any loss in yield. Stewart W. Turner testified, from his observation of appellant's cotton crop in late September, that the amount of herbicide absorption was insufficient to have a significant depressing effect on the yield. In support of this opinion Mr. Turner, after examining all the answers of appellant to many interrogatories propounded by the appellees and the voluminous exhibits attached to those answers giving appellant's cotton and bean production in 1961 and cotton production in 1959 and 1960, prepared the charts, Exhibit D-25 (R. 727), and Exhibit D-26 (R. 732). Exhibit D-25 is a comparison of yield by numbered cotton cuts using green strips for the fourteen alleged damaged cuts and red for the other ten cuts for the three years 1959, 1960 and 1961. The variations among individual cotton cuts in any given year and the production of each cut in different years

is testified to by Mr. Berry and Mr. Kirk as is graphically evident on this chart. The highest production which appellant had in 1961 was on his three cuts, 31, 32, and 33-34. Each of these cuts exceeded two bales to the acre in 1961, but in 1959 cut 31 barely produced over one bale to the acre, and in 1960 slightly less than one-half bale to the acre; cut 32 produced less than a bale to the acre in both 1959 and 1960. This shows, in spite of appellant's claim that in 1961 his cotton was damaged by herbicide to the extent of 250 bales of cotton or over $33,000, his average cotton production in 1959 was one bale per acre, and in 1960 only .85 bale per acre, but in 1961 it was 1.12 bales per acre. Appellant urges that under Jakup v. Lewis Grocer Co., 190 Miss. 444, 200 So. 597, which is relied upon by the appellant, this case was properly submitted to the jury on conflicting evidence as to every material circumstance respecting both negligence and damages. We feel that since the conflicts in this evidence cannot be reconciled, it was up to the jury to resolve them, and this the jury did, in favor of the appellees.

Turning next to the second issue, which is that the evidence adduced is not susceptible to any reasonable conclusion as to the probability of damages to appellant's crops, other than at least some damage was done entitling the appellant to recover, we go to that portion of the testimony upon which the appellant is predicating this claim. Apparently, from the appellant's brief, it is upon the testimony of L. B. Davis, the inspector who testified in behalf of the appellee, and possibly upon the testimony of Stewart W. Turner, who was the consulting agronomist of San Francisco, California, that the appellant is predicating his assertion that the record discloses that there was at least *some damage done* to the appellant's cotton cuts or stands which entitled the appellant to recover. It is true that Davis testified that he detected the presence of herbicides in the appellant's

cotton land, that some of the leaves were withered and elongated, and that the crops showed signs of the presence of 2-4-5-T. It is true that both Davis and Turner admitted this, and it follows that it is from this admission that the appellant bases his claim that there was at least some damage done which would entitle appellant to recover.

 ██ ██ Any lawyer skilled in the trial of lawsuits realizes that witnesses on the stand frequently, under the stress of cross-examination, vary their testimony somewhat from that which was given on direct examination. This is not abnormal and does not indicate that the witness is misrepresenting the truth. It is simply that the questions are couched in different language and are presented in a different manner and elicit different explanations or answers, but when the testimony of the witness is taken and considered as a whole by the jury, frequently that which had appeared to be conflicting testimony with testimony given on direct examination is not in fact conflicting or materially different from that received on cross-examination. A fair examination of the testimony of L. B. Davis would indicate that he stated that the damage done by the application of 2-4-5-T per acre was slight; that it was not enough to worry about and that the application of the herbicide was not of sufficient damage to the cotton to have caused any loss in yield. This witness testified positively to this effect and it was therefore for the jury to determine whether or not the application of the herbicide was sufficient to damage or cause a loss in the yield of the cotton. It apparently felt that the application of the herbicide was not sufficient to cause any loss and, therefore, found for the appellees. The same procedural facts exist insofar as the testimony of the witness Stewart W. Turner is concerned and therefore we cannot agree with the contention of the plaintiff that there was at least some damage done which would entitle the

appellant to recover and which would deny the jury the right to find in behalf of the appellees. To do so would be to invade the province of the jury, which should not be done. The verdict of the jury is not contrary to the overwhelming weight of the testimony and it does not indicate that the jury was influenced by bias or prejudice.

■■■ There are numerous serious conflicts in the testimony on the part of both the appellant and the appellee and it was particularly within the province of the jury to determine and adjudicate the differences. Isolated statements made by a witness cannot be separated and singled out and urged separately and apart from the rest of his testimony and seriously urged as a reason that this particular part of the testimony of the witness should be considered separately and apart in determining a vital question of fact.

The appellee's proof, when taken together with the contradictory proof offered by the appellant, presents disputed facts, material to the determination of whether or not there was negligence in the application of the herbicide and also pertinent with reference to any damages claimed to have been done to the appellant's cotton. Conflicting as this testimony is, the jury had the right to review it, observe the demeanor of the witnesses, and evaluate the evidence developed in this case from beginning to end. This the jury did and we cannot say that the jurors did not act as reasonable men or that they did not have the right to reasonably infer or conclude, as they did, that the appellees in this case were not guilty of the negligence charged against them or that the appellant did not suffer the damages which he claimed.

The case of Belk v. Rosamond, 213 Miss. 633, 57 So. 2d 461, and the case of Lawler v. Skelton, 241 Miss. 274, 130 So. 2d 565, are distinguishable from the case at bar. Conflicting testimony in the case at bar is not found in the case of Belk v. Rosamond. Mrs. Rosamond saw,

or should have seen, the car stalled on the bridge for a distance of 975 feet before she ran into it and caused the death of the child riding on the fender of her car. In the case of Lawler v. Skelton, the pilot admitted flying over the gin platform on which Lawler was working and the only medical evidence tending to negatively causal a relationship between the spraying and the personal injuries was pure conjecture of guesswork on the part of the doctor. That case has no parallel with the case at bar. The evidence in the case at bar is conflicting in practically every material particular.

We turn now to the third error assigned, which is the granting of appellee's Instruction No. 5, which is as follows:

"The Court instructs the jury for the Defendants that even though you believe from a preponderance of the evidence that some of the 2,4-5-T handled and applied by the Defendants to the rice crop of C. A. Duprel came in contact with some of the Plaintiff's 1961 cotton and soybean crops, the burden is upon the Plaintiff to prove by a preponderance of the evidence that such 2,4-5-T so injured or damaged Plaintiff's said crops or portion thereof as to reduce the amount of cotton or soybeans, or both, which said crops or portion thereof would otherwise have produced, and if from the evidence you have *to guess, speculate, or are not convinced* as to whether the yield of the Plaintiff's said crops or portion thereof was reduced by reason of said 2,4-5-T, then you must find for the Defendants." (Underscoring ours).

Appellant contends this instruction demands a greater degree of proof than is required in an ordinary civil case where the plaintiff has only to prove his burden by the "superior or greater weight of the credible evidence," and cites: Gregory v. Williams, 203 Miss. 455, 35 So. 2d 448 (1948); Durrett v. Mississippian Ry. Co., 171 Miss. 899, 158 So. 776 (1935); Mardis v. Yazoo

& M. V. R. R. Co., 115 Miss. 734, 76 So. 640 (1917);
Gentry v. Gulf & Ship Island R. R. Co., 109 Miss. 66,
67 So. 849 (1915); Stevenson v. Yazoo & M. V. R. R.
Co., 112 Miss. 899, 74 So. 132 (1917); Producers Gin
v. Beck, 215 Miss. 263, 60 So. 2d 642 (1952); Gulf Oil
Corp. v. Thatch, 240 Miss. 117, 126 So. 2d 501 (1961);
Lewis v. Lewis, 241 Miss. 83, 129 So. 2d 353 (1961);
Denman v. Denman, 242 Miss. 59, 134 So. 2d 457 (1961).
Furthermore, appellant also quotes from 20 Am. Jur.,
Evidence, Sec. 1248, p. 1100: "Proof beyond a doubt
is not necessary . . .; nor is certainty or convincing
proof ordinarily required."

As the flame continues to attract the moths, so do
dangerous instructions seem to charm attorneys. Fur-
ther criticism of this hazardous instruction to the wise
will be unnecessary; the imprudent, as usual, will learn
only by the hard way.

This Court has repeatedly critized the grant-
ing of an instruction which expatiates or limits the op-
eration of the rule that the plaintiff is required, in an
ordinary civil case, to establish his proof only by the
superior or greater weight of the credible evidence,
as is shown in some of the cases cited by appellant.
Where the related instructions complained of imposed
upon the plaintiff a greater burden than proving by
a preponderance of the credible evidence, we have re-
versed, and properly so, except where the facts clearly
show that a different result would not be reached on
another trial, and except where under Supreme Court
Rule 11 it affirmatively appears, from the whole rec-
ord, that such judgment has not resulted in a miscarriage
of justice.

The appellant, it appears, relies for the most part
upon the Lewis case, supra, and predicates his argu-
ment upon the use of the word "convinced" in Instruc-
tion No. 5 at bar, and urges that this instruction the
jury was told that in order to prove damages by a pre-

ponderance of the evidence, the appellant was required to do so beyond all doubt, reasonable or otherwise, a burden not even imposed upon the State in order to secure a conviction of a crime. Appellant relies upon the varying language in the various instructions given in the pertinent cases cited by appellant, but the only case cited by the appellant in which a form of the word "convince" appeared is in an instruction granted in the case of Producers Gin Assn. v. Beck, supra, which judgment was affirmed. It is not necessary to consider the instructions complained of in each of the cases cited by the appellant for the reason that most of the cases including the instructions are distinguishable from the facts and Instruction No. 5 in the case at bar as illustrated in the Durrett, Lewis, Stevenson, Gentry, and Mardis cases, supra.

 Instruction No. 5 at bar is erroneous, but we do not hold that this case should be reversed because we do not feel that the appellant's rights were prejudiced thereby. We again warn that this dangerous instruction should not be used, just as we did in the Beck case, supra.

The argument urged by the appellant in the case at bar disregards certain parts of Instruction No. 5, which are, "You have to guess, speculate" so that the words "are not convinced" are being urged out of context. The instruction must be considered as a whole, and together with all the instructions received by the appellee and the appellant. The words in an instruction (No. 5) moreover must be accorded their customary and usual significance as we held in Yazoo & M. V. R. Co. v. Williams, 87 Miss. 344, 39 So. 489. In St. Louis & S. F. R. R. Co. v. Ault, 101 Miss. 341, 58 So. 102, likewise we held that if the meaning be clear, then hypocriaical criticism of the verbage employed will be ignored. Though the criticism here is not hypocritical, we nevertheless point out that the words utilized must

304

be construed in their usual, customary significance. Therefore, it appears to us, under the facts as disclosed in the record, that the usual, ordinary, common meaning of the clause complained of by the appellant, namely, "and if from the evidence you have to guess, speculate, or *are not convinced*," conveys only one inclusive general thought or proposition; that the word "convinced", since it is in the conjunctive, must be construed simultaneously with "you have to guess, speculate". It is not necessary to hold that the words "or are not convinced", are synonomous with "have to guess, speculate", since we feel that when Instruction No. 5 is read as an entirety and considered together with all the other instructions given in the case, under the facts herein, the attention of the jury was focused on the real issue of proof. Green Truck Lines, Inc. v. Hooper, 233 Miss. 794, p. 801, 103 So. 2d 443. An impassive, objective consideration of all the instructions granted leads us to the conclusion that the jury obtained a fairly consistent view of the law applicable in the case at bar in spite of this often condemned and highly dangerous instruction. Green Truck Lines v. Hooper, supra, Scoggins v. Vicksburg Hospital, Inc., 229 Miss. 770, 91 So. 2d 837.

The appellant obtained three types of substantive instructions; the first group submitted to the jury the question of negligence and proximate cause. The second group submitted the same question with reference to the wind blowing so as to create a hazard. The third group defined the measure of damages. The appellee obtained six instructions which were not in conflict with the instructions granted the appellant. Appellees' instructions told the jury: No. 1, to find for the appellees if due care had been exercised; No. 2, to find for the appellee if they had not been negligent; No. 3, to find for appellees even if some of the spray reached appellant's crops provided there was no reduction of

yield; No. 4 defined negligence; No. 6, that before the jury could find for the appellant, it must believe that the appellees were negligent, and as a proximate result there was some reduction of appellant's crop yield; No. 5 is the instruction complained of.

■ ■ In appellant's three instructions, the words, ''preponderance of the evidence'', were used nine times; in the appellees' instructions the ''preponderance of the evidence'' element was designated six times, so we conclude that the jury felt the burden of proof was on the appellant, and that his responsibility was to establish his claim by a preponderance of the evidence and by nothing more. The elimination of guesswork, speculation, conjecture and even possibilities, was proper, since these methods do not measure up to the standard of responsible probability. Denman v. Denman, supra; Franks v. The Goyer Company, 234 Miss. 833, 108 So. 2d 217; Peerless Supply Co., Inc. v. Jeter, 218 Miss. 61, 65 So. 2d 240.

As we stated in the Beck case, supra, we find the language to be uniquely applicable here, ''We have carefully considered the voluminous record in this case and we are unable to say that the judgment has resulted in a miscarriage of justice, or that a different result would probably be reached upon another trial, and, while we disapprove the quoted instruction, particularly in the use of the word 'convincing' (''convinced'' here at bar), and warn against its future use, we have reached the conclusion that the error therein is not so prejudicial as to require a reversal.'' See also Rule 11, Revised Rules of the Supreme Court of Mississippi.

■ ■ We do not feel that there is such merit in the other errors assigned as to require a reversal and remanding of this case. Evidence of the controlled experiment and the testimony of Dr. E. D. Robinson which was admitted over objection came within the discretionary latitude of the trial court. We do not feel that

the appellant was prejudiced by this evidence. The experiment was not an effort to duplicate the conditions existing on the appellant's farm as to rainfall, soil condition, method of cultivation, time of fruition or plant characteristics. The experiment's purpose was to establish the fact that 2-4D is far more distructive to cotton than 2-4-5-T and that an application of 2-4-5-T in an amount of one-tenth of a pound per acre depresses the cotton yield on two per cent, as compared to a depression of fifty-four per cent for the same quantity of 2-4D. There was some confusion in the testimony of some of appellant's witnesses as to the differences between these two herbicides. The experiments showed also that appellant's cotton faired much better than did the growth of cotton in the guided experiment of Dr. Robinson. See Lawler v. Skelton, 241 Miss. 274, 130 So. 2d 565; Elliott v. Massey, 242 Miss. 159, 134 So. 2d 478; Brown v. State, 176 Miss. 448, 169 So. 837; 76 A. L. R. 2d 354-361.

In conclusion, this was a hard fought, well briefed lawsuit, which is also proof of the knowledge, experience and durability of the attorneys in this case. After deliberate and careful consideration, we conclude, in spite of any prolixity of the evidence and the conflicts in testimony, that the question of negligence was properly submitted to the jury and the jury likewise properly rendered a verdict for the appellees. The judgment, therefore, is hereby affirmed.

Affirmed.

*Lee, C. J., and Ethridge, Rodgers and Patterson, JJ.,* concur.