**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 98-CA-00763-SCT**

*JASPER BUFORD*

*v.*

*RIVERBOAT CORPORATION OF MISSISSIPPI - VICKSBURG d/b/a ISLE OF CAPRI CASINO*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/20/1998 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BILL WALLER, SR. |
| ATTORNEYS FOR APPELLEE: | LELAND S. SMITH, III |
| | CHRISTOPHER HAL HUGHES |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 02/24/2000 |
| MOTION FOR REHEARING FILED: | 3/9/2000; denied 5/25/2000 |
| MANDATE ISSUED: | 6/15/2000 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This case involves a slip and fall in a casino parking lot. Finding error in the introduction of expert testimony without proper foundation, we reverse and remand for a new trial.

I.

¶2. Sixty-three year old Jasper Buford was on his way to partake of the $1 breakfast special at the Isle of Capri Casino in Vicksburg on August 2, 1996, when he slipped and fell in one of the casino parking lot crosswalks. It had rained that day, and Buford contended that the painted surface was slick from a buildup of oil. Buford's complaint was filed in the Warren County Circuit Court on February 9, 1997, against Riverboat Corporation of Mississippi-Vicksburg, d/b/a Isle of Capri Casino (the Casino) and alleged that the Casino "failed to construct and maintain a reasonably safe walkway for the use of invited guests".

¶3. As an immediate consequence of his fall, Buford suffered a mere ankle sprain. However, the subsequent immobilization of Buford's ankle resulted in a huge blood clot forming through Buford's leg and extending into his abdomen. At one point, Buford suffered a pulmonary embolism when part of the clot broke off and traveled through his lungs. Buford's sprain, in the end, became a greatly debilitating injury resulting in some $82,000 in medical bills. Nonetheless, the trial was less about whether Buford's treatment was reasonable and more about whether the Casino was negligent and, thus, liable for Buford's injuries.

¶4. At trial, the jury returned a verdict for the defendant, judgment was entered accordingly, and Buford

appeals claiming the following: 1) that the trial court erred in allowing evidence concerning experiments made by the Casino's expert, 2) the trial court erred in allowing "no-falls" testimony and 3) that the trial court gave several allegedly erroneous instructions. We find error in the evidentiary issues raised by Buford.

## II.

¶5. The first issue raised by Buford is that the trial court erred in admitting the testimony of the Casino's, George Monroe Hammitt, II, concerning experiments he conducted some time well after Buford's fall and after the surface had been repainted. Hammitt, a professor of civil engineering at Louisiana State University, was accepted by the court as an expert in civil engineering. He inspected the crosswalk and observed that it was treated with a drag and broom finish as required by the specifications. Hammitt went back to the parking lot on another day and performed tests designed to measure the coefficient of friction. The coefficient of friction, Hammitt explained, is a term designed to describe the relationship between the vertical force and the horizontal force. It can also be described as a measurement of traction or how slippery something is. Hammitt took a shoe, placed a weight in the shoe, and then dragged the shoe across the pavement while weighing the horizontal pull with a device used to weigh fish. By dividing the vertical force into the horizontal force, he arrived at a coefficient of above .45. A measurement of 0 is slippery, and 1.0 is not slippery. The National Academy of Science requires only .37 for rubber on concrete. The fact that the surface had been painted after the fall and before Hammitt conducted his tests, Hammitt testified, meant that the surface was even less slippery before since paint tends to fill in the little valleys in the surface. Hammitt testified that he also tested the surface wet and even then it was above .37.

## III.

¶6. The admission of experimental evidence is within the discretion of the trial judge. *Jackson v. State*, 551 So.2d 132, 139 (Miss. 1989); *Hines v. State*, 339 So.2d 56, 57 (Miss. 1976). In *Illinois Cen. Gulf R.R. v. Ishee*, 317 So.2d 923 (Miss. 1975), the Court held that for an experiment purporting to reconstruct an event to be admissible, it is not required that all conditions be precisely reproduced but they must be so nearly the same in substantial particulars as to afford fair comparison in respect to particular issue to which test is directed. In *Ishee*, the plaintiff, who was lying on railroad tracks, was struck by a train. At issue was whether the conductor could have seen the plaintiff in time to stop the train. A witness for the plaintiff was permitted to testify that an experiment conducted some months after the accident revealed that a person on the track could be seen from 955 feet. This Court held that the admission of the experiment was error because testimony showed that the area where the plaintiff had been found was cleared right after the accident.

¶7. In *Pittman v. Mississippi Power & Light Co.*, 368 So.2d 238 (Miss. 1979), the plaintiff's husband was killed when he was struck by a utility pole which broke when the decedent's tractor came in contact with a guy wire. The utility showed the jury a film of a tractor applying force to a guy wire of a pole and breaking the pole. On appeal, we reversed because there were a number of material variations between the actual event and the reconstructed event depicted in the film. *Pittman*, 368 So.2d at 240.

¶8. We face essentially the same problem here where Hammitt's testing was done after the surface was repainted. Ameliorating the testimony is the fact that the jury was informed that the surface was repainted prior to Hammitt's testing. Hammitt even testified that the repainting would make the surface more slippery since the paint would tend to fill in "the little hills and valleys" in the concrete. Thus, Hammitt concluded, the surface would have been **less slippery** prior to its being repainted. Nonetheless, Hammitt admitted that if

the condition of the parking lot was significantly different when Buford fell, Hammitt's tests would not be accurate. The jury, having been informed of the repainting, could certainly take this into consideration in weighing Hammitt's testimony.

¶9. The usefulness of Hammitt's testimony, however, was debatable given the fact that the surface had been repainted and there was no testimony establishing that the repainting was done with the same paint as had been originally applied. The problem with Hammitt's testimony is that it appears to be premised on the belief that the stripes were repainted with the same paint, or type of paint, with which they had been painted previously.[1] And they may well have been but the record is entirely unclear on this point. Buford's proposed witness James Wyatt[2] might have testified that the paint was the same but no one ever called him to the stand. Because the Casino was the proponent of Hammitt's testimony, the Casino had a duty to lay the proper foundation for the tests. Had the Casino offered evidence, through Hammitt, Wyatt, or whomever, that the paint was the same as that which had been on the concrete when Buford fell and that in July of 1997, Wyatt had added one (or two or however many) coats of the same paint, Hammitt's testimony would have had some value. Without this foundation, Hammitt's testing was meaningless.

¶10. In *Duke v. American Olean Tile Co.*, 400 N.W.2d 677 (Mich.App. 1986), the plaintiff fell on tile in a fast food restaurant. Plaintiff presented evidence from an expert that the floor had a coefficient of friction of .32 when wet. The expert used a drag-type meter and the plaintiff's shoes in conducting the tests. The defense objected to the introduction of this testimony because the tests were conducted five months after the plaintiff's fall and there was no evidence that the floor was in the same condition as the day on which plaintiff fell. The trial court allowed the testimony stating "there has been no testimony that [the floor] was any different. Now if you are going to introduce some testimony that there was some change in it, I will entertain your motion, but I would like to know what that change is." *Duke*, 400 N.W.2d at 680. On appeal, the court reversed, and stated:

> The trial court's ruling was erroneous because the issue was not whether testimony was presented tending to show that the conditions changed, but whether there was testimony tending to establish a substantial similarity of conditions. The trial court's decision effectively shifted the burden of proof on this factual issue to defendant. The burden, however, is on the party presenting the evidence to satisfy the court that the necessary similar conditions exist.

*Duke*, 400 N.W.2d at 680.

¶11. Because the Casino failed to lay a proper foundation that the conditions of the crosswalk were substantially similar to what they were on the day that Buford fell, the trial court should have sustained Buford's objection to this evidence. The failure to do so was reversible error.

IV.

¶12. The second issue raised by Buford is that the trial court erred when it allowed the defense to present testimony that there had been no other falls in the parking lot. Again, we find that this testimony was erroneous given the lack of foundation.

¶13. Fred Nolan Brown testified that he had worked for the Isle of Capri as a bus driver. He was asked whether he had ever seen anyone fall in the parking lot. He replied that he had never seen anyone fall in the parking lot but that he had seen them fall in other places.

¶14. The Casino's expert, George Hammitt, was asked whether he had found out whether there had been any other falls on the parking lot. Despite the fact that trial court sustained Buford's objection to Hammitt's testifying as to what he was told, the Casino's attorney "asked" Hammitt "if I understood what you just said, you learned that there had been no other reported falls . . . ." Buford's objection was again sustained.

¶15. David Brooks, the security guard, was asked whether in his four years at the casino he was aware of any other falls in the parking lot. Over plaintiff's objection, Brooks was permitted to testify that he knew of none.

¶16. Rose Wilson, the risk manager for Isle of Capri, testified that several thousand people visit the Casino daily. She received no reports of falls other than Buford's on August 2, 1996.

¶17. Buford argues that it was error for the trial court to allow the Casino to adduce testimony that no one had ever fallen in the parking lot before. *Parmes v. Illinois Cen. Gulf R.R.*, 440 So.2d 261, 265 (Miss. 1983)(evidence of prior accidents is not admissible to show negligence per se). "In order for the 'no falls' evidence to be admissible," Buford argues, "it would have to be presented by witnesses who could testify that they crossed this crosswalk under the same circumstances as to weather, surface material, and paint and did not fall."

¶18. The Casino argues that the admission of this evidence was within the discretion of the trial judge. Furthermore, this Court held long ago that it was error to prohibit a defendant from offering evidence that no other accident had occurred in the place where the plaintiff was injured. *Southern Ry.. v. McLellan*, 80 Miss. 700, 709, 32 So. 283, 284 (1902). The Casino also cites McCormick on Evidence § 200, at 476 (2d ed. 1972) for the proposition that evidence of the absence of accidents is admissible: "It would seem that if other accidents and injuries are admissible where circumstances are similar . . . then logically it would follow that proof of accidents during a period of similar exposure and experience would generally be receivable to show the nonexistence of these facts."

¶19. Ironically, prior to trial, the Casino asked the court to prohibit Buford's witnesses from testifying that they had seen people fall in the parking lot prior to Buford's fall. After hearing argument, the trial court ruled that the witnesses could testify concerning prior falls only where those falls took place under similar circumstances, i.e., rainy weather.

¶20. Judges asked to admit evidence of other similar accidents will scrutinize the evidence carefully "[i]n light of the prejudice that such evidence can carry with it." McCormick on Evidence, § 200, at 587 (3d ed. 1984). "The purpose for the evidence is important in determining whether the proof will be admitted and how strictly the requirement of similarity of conditions will be applied." *Id.* (footnotes omitted).

¶21. As for evidence of a lack of accidents, despite the tendency of many courts to exclude such evidence,

> [a] large number of cases recognize that lack of other accidents may be admissible to show (1) absence of the defect or condition allege, (2) the lack of a causal relationship between the injury and the defect or condition charged, (3) the nonexistence of an unduly dangerous situation, or (4) want of knowledge (or of grounds to realize) the danger.

*Id.* at 591-92 (footnotes omitted).

¶22. In *Lawler v. Skelton*, 241 Miss. 274, 130 So.2d 565 (1961), plaintiff sued for injuries suffered after

having been sprayed with pesticides by a crop duster. The defendant introduced the testimony of a county extension agent and several farmers that they had seen people sprayed with similar pesticides and had never seen anyone injured. On appeal, the Court held that the introduction of this testimony was not error. "[T]here was shown a sufficient similarity of circumstances and conditions to warrant the admission of this evidence, for whatever probative value it might have on the issue of whether the spraying of plaintiff was a proximate cause of his acute illness." *Lawler*, 241 Miss. at 287, 130 So.2d at 569.

¶23. In *Pippin v. Ranch House S., Inc.*, 366 A.2d 1180 (Del. 1976), the plaintiff brought suit against a restaurant after she fell on the sidewalk just outside the restaurant's front door. At the point where plaintiff fell, the sidewalk contained a single step painted yellow to make the step more conspicuous. Plaintiff contended that the restaurant should have installed a handrail. The managing owner of the restaurant was permitted to testify that, as far he knew, no one had ever fallen on the step in the fourteen months the restaurant had been open. In considering the admissibility of this evidence on appeal, the court held that, in general, this type of evidence is "probative, and therefore admissible, provided a proper foundation is laid." *Pippin*, 366 A.2d at 1182. However, the *Pippin* court reversed the case on the grounds that the defendant "failed to establish that the physical conditions, during the use to which he testified, were reasonably comparable to the circumstances when plaintiff fell."

> [A] party who wishes to offer evidence as to the absence of other accidents must show that, during the period in question, the physical circumstances prior to the accident were reasonably comparable to those in issue. Additionally, it must be shown that the person offering the testimony is one who would, in the ordinary course of events, have personal knowledge of the condition or that he is the person to whom reports as to accidents would ordinarily be made.

*Pippin,* 336 A.2d at 1183. However, the court opined, "[r]arely will a defendant be able to produce evidence that the place in question was under such continuing scrutiny that personal knowledge of its condition throughout the time period can be shown." *Pippin*, 366 A.2d at 1183.

¶24. If there was any error in admitting the "no falls" evidence in the instant case, again, that error lies in the lack of an adequate foundation. Wilson's testimony that there were no other falls reported that same day would seem to withstand the test of sufficient similarity. Even then, however, if the area was cleaned up right after Buford's fall, the absence of falls the rest of the day would not be probative. The other testimony, however, was questionable. Evidence along the lines of "I worked there for four years and never saw anyone fall" without more is the sort of reckless testimony that can mislead the jury.

¶25. Because we reverse this case based on the lack of foundation for Hammitt's testimony, we do not have to decide whether the "no falls" evidence also mandates reversal. Nonetheless, parties who propose to introduce such evidence in future should be mindful that the proponent of the evidence has the burden of laying the proper foundation for the evidence.

V.

¶26. Since this case is to be remanded for trial, we stress that the use of unavoidable accident instruction should be used with caution, as in this case, the evidence presented was one of negligence and not an unavoidable accident. Instruction D-5 is as follows:

> The Court instructs the jury that in the course of human events and the progress of civilization,

unavoidable accidents occur, and it is recognized by law that unavoidable accidents do indeed occur and as a result of which people are injured when there is no negligence, and in this case, if the jury believes from a preponderance of the evidence that the accident in question and the resulting injuries, if any, were the result of an unavoidable accident and not of negligence on the part of defendant, Isle of Capri, then it is your sworn duty to return a verdict for the defendant.

¶27. Buford argues that the instruction was error because "[t]here is no circumstance by which this accident could be unavoidable, it was clearly caused by the negligence by either the Plaintiff or the Defendant. Furthermore, Buford argues, this Court has previously cautioned against the use of the word "accident" in negligence cases. *J.M. Griffin & Sons, Inc. v. Newton Butane Gas & Oil Co.*, 210 Miss. 797, 809, 50 So.2d 370 (1951).

*¶28.* The Casino argues that the instruction given in this case was "the mirror image" of an instruction approved in *Shields v. Easterling*, 676 So.2d 293, 296 (Miss. 1996).

¶29. Prosser has defined an unavoidable accident "as an occurrence which was not intended, and, which, under all the circumstances, could not have been foreseen or prevented by the exercise of reasonable precautions." William L. Prosser, The Law of Torts § 29 at 140 (4th Ed. 1971) (footnote omitted).

¶30. According to Prosser,

> No accident, of course, is entirely inevitable, so long as its results from any involuntary act. If the defendant rides a horse, which runs away with him and injures the plaintiff, the accident is not strictly inevitable, since the defendant intentionally rode the horse, and might have prevented all harm by keeping him in the barn. But the runaway is called 'unavoidable' if it did not result from any lack of proper care in the management of the horse, because both wrongful intent and negligence are lacking. There is no liability in such a case . . . (Such a rule is) adopted because the line must be drawn somewhere, and if the defendant is to be held liable merely because he has ridden the horse . . . it would be quite as logical, at least in the eyes of the law, to hold him liable for owning it, or even for drawing his breath, or being born. To hold that he does every voluntary act at his peril, and must insure others against all of the consequences that may occur, would be entirely unreasonable and quite intolerable burden upon all human activity.

*Id.* at 140-41 (footnotes omitted).

¶31. The Casino is correct in that this Court only recently held that an unavoidable accident instruction was not erroneous in a case concerning a one-vehicle accident. *Shields v. Easterling*, 676 So.2d 293, 298 (Miss. 1996). However, we note the growing criticism of the unavoidable accident instruction in negligence cases.[3]

¶32. The courts which still allow the instruction confine its use to situations where the accident may truly be said to be unavoidable as in *Hollingsworth v. Thomas*, 250 S.E.2d 791 (Ga.Ct.App. 1978), in which a milk maid lost the vision in one eye after being struck by the tail of the cow she was milking.

¶33. As can be seen from this example, the case where the unavoidable accident instruction has any utility is a rare one. Trial courts employ this instruction with caution. In this case there was no evidence to support this instruction.

VI.

¶34. Because the evidence concerning Hammitt's experiments lacked a proper foundation, we reverse the judgment of the Warren County Circuit Court and remand this case for a new trial consistent with this opinion.

¶35. **REVERSED AND REMANDED.**

> **PRATHER, C. J., SULLIVAN AND PITTMAN, P. JJ., AND BANKS, J., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MILLS AND COBB, JJ. WALLER, J., NOT PARTICIPATING.**

> **SMITH, JUSTICE, DISSENTING:**

¶36. On a rainy August 2, 1996, Jasper Buford was hurrying to enter the Isle of Capri Casino in order to take advantage of the $1 breakfast special when he slipped and fell in a parking lot crosswalk. Buford claimed a buildup of oil was on the surface of the crosswalk and that the Casino had failed to construct and maintain a reasonably safe walkway for its invited guests. After hearing all evidence and testimony, including that of experts who testified for both parties, the jury returned a verdict in favor of the casino.

¶37. The majority reverses and remands, granting Buford a new trial, because of supposed improper testimony by the casino's expert concerning his experiments and tests, and because of error regarding testimony concerning prior falls in the parking lot.

¶38. Additionally, although the majority does not overrule the unavoidable accident instruction allowed in *Shields v. Easterling*, 676 So.2d 293, 298 (Miss. 1996), the majority nevertheless is openly critical of the recently approved instruction. The majority advises "trial courts to employ this instruction with caution," and also holds that there was "no evidence that was presented for this instruction." Majority Op. at 13. To the contrary, there is sufficient evidence to allow the instruction, and there is no reason for the majority's attack on *Shields*. I respectfully disagree and therefore dissent.

¶39. First, we examine Buford's objections to the Casino's expert George Hammitt, a professor of civil engineering at Louisiana State University. Hammitt testified, *inter alia*, that the crosswalk in question had been finished with a "drag and broom" finish as required by specifications. The slope was under 6%, which was the specified maximum according to the city code. Hammitt conducted a total of sixty-four tests designed to measure the coefficient of friction, which is a term designed to describe the relationship between the vertical force and the horizontal force. In lay terminology this can be described as a measurement of traction, or simply put, how slippery a surface may be. A coefficient of 0 is a slippery surface. The National Academy of Science requires a coefficient of .37 for rubber on concrete. Hammitt placed a weight in a shoe and dragged the shoe across the crosswalk while weighing the horizontal pull in order to arrive at a coefficient which was above .45. Hammitt also poured water over the surface in order to test it wet, which would reflect conditions of the surface on the day of the accident. Again, the coefficient was above .37. After extensive testing, Dr. Hammitt opined that the crosswalk at issue was safe.

¶40. Buford claims that he offered no such friction tests and that the evidence of Hammitt's test was affirmative proof not in rebuttal. Thus, Buford claims that Hammitt's evidence was irrelevant and immaterial.

Buford's theory of the case was improper design in that the surface of the crosswalk was slippery when wet. Paul Box, Buford's expert, so testified.

¶41. Buford also complains that the test was performed seventeen months after the accident and that the surface of the crosswalk had been repainted. The majority's reliance upon *Illinois Cent. Gulf R.R. v. Ishee*, 317 So.2d 923 (Miss. 1975), is misplaced. In *Ishee*, the issue turned on whether the railroad conductor could have seen Ishee, who was lying on the train tracks, in time to stop the train. The plaintiff's witness conducted an experiment, some six months after the accident in question, and testified that, from this experiment, he could see an individual lying on the tracks. The Court held that the experiment should not have been admitted into evidence. The Court reasoned that because entire right of way of the scene at issue had been completely cleared of the heavy, weedy vegetation which had supposedly blocked the view of the conductor at the time of the accident, the admission of the experiment conducted under such significant, material changes between the actual event and the experiment was reversible error. *Id.* at 925. The Court also noted that the experiment was conducted from a stationary stepladder at an elevation of nine feet , while the conductor's view at the time of the accident was from a train traveling 28 miles per hour at a time when the engineer was performing all the duties incident to operating a locomotive. *Id.* at 926.

¶42. The *Ishee* Court stated, however, that for an experiment to be admissible, it is not required that all conditions be precisely reproduced, but that they must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed. *Id.* at 925. The Court explained that "[t]hese questions are largely within the sound discretion of the trial judge, and that the only effect of a variation between a precise and a substantial reproduction is as to the weight of the experimental evidence rather than its admissibility." *Id.* at 926 (citing *Brown v. State*, 176 Miss. 448, 169 So. 837 (1936)).

¶43. Here, the majority attempts to show that "if the condition of the parking lot was significantly different when Buford fell, Hammitt's tests would not be accurate." The majority also questions the "usefulness of Hammitt's testimony." Majority Op. at 4. The only change in the condition of the parking lot was the repainting of the crosswalk, of which the majority makes much ado about nothing in its claim that a different paint may have been used to repaint the crosswalk. The majority writes that Hammitt's testimony thus had no foundation and that the "testing was meaningless." To the contrary, Hammit acknowledged in his testimony that the crosswalk had been repainted since the accident in question and, in fact, testified that repainting would actually make the surface of the crosswalk more slippery because the paint would tend to fill in the little hills and valleys in the concrete. As noted in *Ishee*, the admission of Hammit's testimony, including the experimental evidence, was within the trial judge's discretion, and the only effect of the variation between a precise and a substantial reproduction is as to the weight of the experimental evidence, not its admissibility. *Id.* at 926.

¶44. In fact, Buford was concerned only about the repainting of the surface insofar as the admissibility of Dr. Hammitt's testimony was concerned. Buford could have objected to Dr. Hammitt's coefficient friction tests prior to and during trial, but did not do so. The Casino's counsel advised the trial court of Dr. Hammitt's testimony concerning friction testing, whereupon, in response, Buford's counsel stated, "I don't have any problem with that, Judge. That's an engineering opinion."

¶45. Buford also had his own expert who faulted the design and safety of the crosswalk and its tendency to be slippery when wet as the cause of the slip and fall by Buford. Buford also claimed that the surface was

oily. This would tend to certainly increase the probability of a slippery surface already wet from rain. The painting of the surface is of no great consequence here in view of Hammitt's testimony that such would further increase the probability of a slippery surface. The jury heard and considered Box's testimony, Hammitt's direct testimony and extensive cross-examination on the validity of the tests conducted regarding the subject matter. The weight and credibility of witnesses, primarily experts, is for the jury. *BF Goodrich, Inc. v. Taylor*, 509 So.2d 895, 903 (Miss. 1987). The jury was free to accept or reject any of the expert testimony, and apparently the jury gave more weight to Dr. Hammitt's explanation of what happened when Buford fell on the crosswalk. *See Couch v. City of D'Iberville*, 656 So.2d 146, 152 (Miss. 1995) (citing *Poirrier v. DeGrande*, 604 So.2d 268, 270 (Miss.1992)). This Court, of course, is not the jury. *Goodrich* at 903.

¶46. Rule 702 of the Mississippi Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The trial court is given wide latitude in qualifying expert witnesses, and absent a showing that the trial judge abused his discretion, the Supreme Court is bound to uphold the judge's decision. *Ducker v. Moore*, 680 So.2d 808, 811 (Miss. 1996). The admission of expert experimental evidence is thus within the sound discretion of the trial judge. *Jackson v. State*, 551 So.2d 132, 139 (Miss. 1989); *Building Insulators, Inc. v. Stuart*, 243 Miss. 287, 294, 136 So.2d 613, 615-16 (1962) . The trial judge here allowed the experts for both sides to testify. He certainly did not abuse his discretion.

¶47. The end result of the majority view, upon reversal and remand for a new trial, would be to create a hurdle which the defendant could not possibly overcome and likely create a distinct advantage for the plaintiff, to which, when considering fairness, the plaintiff is not entitled. *Illinois Cent. R.R. v. Gandy*, No. 97-CA-00942-SCT, 1999 WL 1000684, at *9-12 (Miss. Nov. 4, 1999)(Smith, J., Prather, C.J., Mills & Cobb, JJ., dissenting). In *Mississippi Power & Light Co. v. Lumpkin*, 725 So.2d 721, 734 (Miss. 1998), this Court held that the trial court's denial of defense expert testimony regarding foreseeability was error because "[f]oreseeability was clearly the main issue in the case about which Lumpkin was prepared to and did offer expert testimony." The Court noted that Lumpkin was aware before trial that the expert would testify regarding foreseeability; thus, the Court reasoned that "Lumpkin does not even claim actual surprise or prejudice if this testimony was admitted." *Id.* Here, Dr. Hammitt's testimony goes to the very heart of the main issue of the case, about which Buford was also prepared to offer and did offer expert testimony of his own. The issue was properly fleshed out by both sides. There is no error here.

¶48. In *General Motors Corp. v. Jackson*, 636 So.2d 310 (Miss. 1992), this Court faced, *inter alia*, the issue the admissibility of experiments conducted by experts. The Court found no problem with the plaintiff's expert testimony, based in part upon an experiment. The Court, without elaboration on the factual details involved, noted, "The Jacksons' experts presented evidence that the axle was defective and further, that the accident was caused by a stress fracture in the axle. General Motors presented no experts to contradict any of the Jacksons' witnesses on the issues of damages." *Id.* at 313. However, the dissent pointed to the actual experiment conducted by both sides in order to demonstrate to the jury the likelihood of a roll over due to over-steering by the plaintiff, as claimed by General Motors, or the breaking of the axle in question at the flange end prior to the plaintiff's losing control of her vehicle, as claimed by the plaintiff. The experiment relied upon by the plaintiff's experts was as follows:

Rhoades tendered to the jury a taped video demonstration which purported to depict the Jacksons'

theory of how the accident occurred. The video tape depicted a stationary vehicle in a jacked up position, which was suddenly allowed to fall, as though its left rear axle had fractured. This maneuver was accomplished by speeding up single frame pictures, **giving the illusion of motion.** Rhoades testified, "Lets go on through the pictures now, and we'll put it all together on the video and give it some **motion and life.**" (emphasis added). Rhoades' weak attempt to give life, hence credibility, to this staged video is dead on arrival. This misguided purportedly re-enacted evidence should never have been allowed in the first place. The relevancy of the demonstration is highly questionable because it failed to simulate the actual nature of the events, the conditions in effect at the time of the accident, and the mechanics of the Jackson vehicle. This kind of demonstration would tend to confuse and mislead the jury. According to Jackson, the axle fractured under supposedly normal driving conditions, with the vehicle moving at the rate of 55 to 60 m.p.h., not as in Rhoades' video while the vehicle was at a dead-stop. That presents the major flaw to the Rhoades demonstration. It seemingly never occurred to Rhoades that the wheel was actually traveling 55 to 60 m.p.h. when, according to Rhoades' theory, it broke off of the axle and that its movement would have been affected by the fact it was in motion. Rhoades apparently never heard of Sir Issac Newton and his laws of gravity and motion.

Cut an axle in half on a stationary jacked up vehicle and the wheel will simply drop. Newton, "Law of Gravity."

But, if the vehicle is moving forward at the rate of 55 to 60 m.p.h., some 80 feet per second, if the axle suddenly snaps in two, as Jackson claimed, that wheel is going to roll. Newton, "Law of Motion."

If a refutation of Rhoades' theory was needed, General Motors' video demonstration duplicating how Jackson claimed the accident occurred, showed precisely that what Rhoades said caused the accident was an utter impossibility.

. . .General Motors by experiment and video demonstration showed what would happen with an axle breaking on a Jimmy traveling at this speed.

*Jackson*, 636 So.2d at 322-23 (Smith, J., Hawkins, C.J., & Prather, P.J., dissenting)(footnotes omitted & emphasis in original).

¶49. In *Jackson*, there was no comparing the relevancy and effectiveness of the two counter experiments in demonstrating the events which occurred on the date and time of the accident in reconstructing the cause thereof. In spite of the objections to the plaintiff's experiment by the defense as well as three members of this Court in dissent, the Court saw nothing wrong with the plaintiff's experiment and allowed such to stand without a finding of error. If the plaintiff's experiment in *Jackson*, of jacking up a stationary vehicle and allowing it to fall, satisfied the test and was significantly representative of the scene and sufficient to establish a substantial similarity of conditions at the time, then practically any version of events would satisfy the requirements in the case at bar. Here, in my view, there is substantial similarity of conditions at the time to allow the Casino's expert testimony. The majority errs substantially in finding otherwise. The majority is vastly inconsistent, considering the view espoused by the majority in *Jackson* as compared to the case at bar. Accordingly, this Court should find no merit to this issue.

¶50. Next, we review the majority's opinion that the trial court erred for lack of a foundation in allowing the

Casino to present evidence of no prior falls in the parking lot. This position is exceedingly interesting considering that the record reveals that prior to the commencement of trial, the Casino filed a motion in limine to exclude Buford's evidence regarding the occurrence of prior falls in the parking lot of the casino. It was Buford, not the Casino, who first argued at that time in support of the admission of this type of evidence. The trial court ruled that "whether or not other persons fell in this area of the parking lot may be relevant on the issue of whether or not an unsafe condition existed." Then, in support of his prior argument during his case in chief, Buford called Fred Brown, a former bus driver for the Casino. Brown testified that he had seen people fall under the canopy and inside the restaurant, but he had never seen anyone fall in the parking lot.

¶51. This Court has stated, "Questions of relevancy and admissibility are left to the discretion of the trial court." *Fielder v. Magnolia Beverage Co.*, No. 97-CA-00172-SCT, 1999 WL 250981, at *3 (Miss., Apr. 29, 1999). Was the absence of accidents relevant and admissible? The obvious, which begs the question is: "Did Buford open the door to this type of evidence?" Almost one hundred years ago this Court, in *Southern Ry. v. McLellan,* 80 Miss. 700, 709, 32 So. 283, 284 (1902), held that it is error to prohibit a defendant from offering evidence that no other accident had occurred in the place where the plaintiff was injured. In the case at bar as previously noted, Buford first argued in support of admissibility of prior falls evidence, then offered such evidence himself during his case in chief. Subsequently, the Casino offered the testimony of several witnesses reflecting that numerous individuals in similar conditions had walked through this same area where Buford fell without falling. Thus, the door had been opened by Buford, and the Casino laid the proper and necessary foundation to have the absence of prior accidents admitted into evidence. I find no merit to this issue.

¶52. This should have ended that discussion because the majority at the beginning stated that only two issues warrant discussion. Then, the majority, as previously noted, proceeds to criticize the "unavoidable accident" jury instruction that was allowed in the case at bar. This issue was a separate and distinct from the other two issues which the majority discusses. This Court has long held that the granting of an unavoidable accident instruction depends upon the circumstances of the particular case. *Cotton v. Quinn*, 245 So.2d 593, 594 (Miss. 1971). Instruction D-5 which the majority is so critical of is but a mirror image of the instruction recently approved by this Court in *Shields v. Easterling*, 676 So.2d 293, 296 (Miss. 1996). In retrospect, the majority should have addressed this issue because the case at bar is indeed nothing more than an unavoidable accident, pure and simple.

¶53. Did the Casino present sufficent evidence to support the granting of the instruction? Dr. Hammitt's evidence testified to from some sixty-four tests conducted on the cross-walk was that the crosswalk was safe. Buford's expert, Paul Box, had established minimum guidelines during his testimony, and the proof from Hammitt's tests was that the crosswalk exceeded the minimum guidelines. Buford himself first put on proof of falls in two other locations in the casino, but that witness also admitted that he was unaware of any other falls on the crosswalk. The Casino then offered other testimony to the effect that there had been no other falls on the crosswalk or parking lot. One witness, Wilson, testified that no other falls were reported that very same day. Even the majority acknowledges that such testimony "would seem to withstand the test of sufficient similarity." Majority Op. at 10. There is more than ample testimony to support the giving of an unavoidable accident instruction to the jury for their consideration as a possible defense by the Casino. There are some cases occasionally presented where the alleged negligence is no negligence at all, and the events in question comprise nothing more than a mere unavoidable accident. This Court has so stated in *Fulton v. Robinson Indus., Inc.*, 664 So.2d 170, 174 (Miss. 1995). "The incident must be chalked up

to sheer misfortune of the one injured, an accident, pure and simple." *Id.* The case at bar falls squarely within that definition.

¶54. I fear this criticism of *Shields* is but an attempt to set the tone for overruling this recent opinion of the Court. A dead giveaway is the majority's suggestion in footnote 3 of "growing criticism of the unavoidable accident instruction in negligence cases," and its warning to trial judges. In fact, all of the cases cited by the majority as indicative of this growing new criticism are cases decided well in advance of this Court's decision in *Shields*. Surely the majority is not suggesting that this Court was unaware of this supposed trend prior to our decision in *Shields*. *Shields* was properly decided and in my view is good law. The granting of an unavoidable accident instruction is proper if the evidence supports it. This issue is determined on a case-by-case basis depending on the circumstances of each case. *Cotton* 245 So.2d at 594. Here, the evidence is sufficient, thus the granting of the instruction was proper. I would affirm the trial court and jury.

¶55. For these reasons, I respectfully dissent.

## MILLS AND COBB, JJ., JOIN THIS OPINION.

1. At one point, plaintiff's counsel told the judge, "they went out and put more paint on the crosswalks . . . ."

2. Ironically, it was Buford who indicated that he might wish to call (as a rebuttal witness) the man who actually repainted the parking lot, James Wyatt. The Casino objected to the testimony on the basis that Wyatt's name had been disclosed to them only a week prior to trial. The trial court postponed ruling on the witness until such time as Buford made a decision on whether to call him. Buford never did call Wyatt as a witness.

3. *Alaska Brick Co. v. McCoy*, 400 P.2d 454 (Alaska 1965); *City of Phoenix v. Camfield*, 400 P.2d 115 (Ariz. 1965); *Butigan v. Yellow Cab* Co., 320 P.2d 500 (Cal. 1958); *Schoen v. Boulder Stage Lines, Inc.*, 412 P.2d 905 (Colo. 1966); *Sadorus v. Wood*, 230 A.2d 478 (D.C. 1967); *Smith v. Canevary*, 553 So.2d 1312 (Fla.Dist.Ct.App. 1989); *Tolbert v. Duckworth*, 423 S.E.2d 229 (Ga. 1992); *Schaub v. Linehan*, 442 P.2d 742 (Idaho 1968); *Miller v. Alvey*, 207 N.E.2d 633 (Ind. 1965); *Weinand v. Johnson*, 622 N.E.2d 1321 (Ind.Ct.App. 1993); *Koll v. Manatt's Transp. Co.*, 253 N.W.2d 265 (Iowa 1977); *Wooten v. Legate*, 519 S.W.2d 385 (Ky. 1974); *George v. Guerette*, 306 A.2d 138 (Me. 1973); *Graham v. Rolandson*, 435 P.2d 263 (Mont. 1967); *Dyer v. Herb Prout & Co.*, 498 A.2d 715 (N.H. 1985); *Vespe v. DiMarco*, 204 A.2d 874 (N.J. 1964); *Fenton v. Aleshire*, 393 P.2d 217 (Or. 1964); *Hukill v. H.E.B. Food Stores Inc.*, 756 S.W.2d 840 843-44 (Tex.App. 1988); *Randle v. Allen*, 862 P.2d 1329 (Utah 1993); *Hunter v. Johnson*, 359 S.E.2d 611 (W.Va. 1987).