# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00668-COA

**NORMA YARBOROUGH AS EXECUTRIX FOR THE ESTATE OF DONNA SCOTT, DECEASED**                                      **APPELLANT**

**v.**

**SINGING RIVER HEALTH SYSTEMS**                                      **APPELLEE**

DATE OF JUDGMENT:                03/15/2021
TRIAL JUDGE:                     HON. KATHY KING JACKSON
COURT FROM WHICH APPEALED:       JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          RYAN JOSEPH CANON
ATTORNEYS FOR APPELLEE:          BRETT K. WILLIAMS
                                 WILLIAM ROBERTS NORMAN
NATURE OF THE CASE:              CIVIL - PERSONAL INJURY
DISPOSITION:                     AFFIRMED - 01/03/2023
MOTION FOR REHEARING FILED:

### BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.

### GREENLEE, J., FOR THE COURT:

¶1.     Norma Yarborough, as executrix for the estate of Donna Scott,[1] appeals from the judgment of the Jackson County Circuit Court finding no liability against Singing River Health Services in a personal injury action involving a fall from steps on a bus. Finding no reversible error, we affirm the circuit court's judgment.

### FACTS AND PROCEDURAL HISTORY

¶2.     Singing River Health Services (Singing River) operated a transportation service to

---

[1] Scott initially brought this lawsuit but passed away from unrelated issues shortly after filing the complaint. We will refer to the plaintiff/appellant as "Yarborough" unless specificity requires otherwise.

provide elderly and disabled patients with free transportation to and from their respective medical appointments. This service used small buses or vans that had built-in steps for access into the vehicle, as well as a mechanical lift to provide access for wheelchair-bound and other disabled passengers. The service was funded through a contract with the Mississippi Department of Transportation requiring that Singing River transport at least seventy percent of patients who were either at least fifty-five years old or classified as disabled. However, any citizen in Jackson County could use the buses for their medical needs if they contacted Singing River.

¶3.     Donna Scott, Norma Yarborough's seventy-six-year-old mother, was living in Jackson County with Yarborough at the time of the incident. Scott had several ongoing medical conditions, including renal failure, that required her to attend a dialysis center several times a week. Donna Scott used the service and maintained a standing order agreement with Singing River to provide transport to her dialysis appointment three days a week.

¶4.     Singing River's drivers were provided with schedules that indicated which passengers would be picked up for the given day. This schedule included several passenger designations that indicated the necessary service required. These designations included "Lift" (or "LiftUse") to indicate that a passenger needed to use the bus's mechanical lift system or "Ambulatory," indicating they needed no special assistance.[2] Scott's designation varied

---

[2] Additional designations included "Wheel Chair" (or "WC"), indicating the passenger was wheelchair-bound and required the lift; "Elderly," indicating the passenger was over the age of fifty-five; or some combination of designations, such as "Lift Elderly."

2

depending on the given day; sometimes she was marked as "Lift," and sometimes she was not. Passengers were required to inform Singing River whether they would need to use the lift function of the buses, and in the case of standing orders, passengers were requested to update Singing River if they needed to change their designation. As an added precaution, drivers were trained to observe passengers on the day of their pickup to determine whether the lift would be required. In addition to the schedule, drivers were required to fill out a "Dailey Ridership Report" that gave details of each day's events, including passenger information.

¶5. Scott's injury occurred on December 27, 2018. She was sitting outside her home waiting for her scheduled 9 a.m. pick-up with Singing River. Singing River's employee Alfred Padgett was the scheduled driver. Padgett had picked up Scott on many occasions before the injury. Scott's designation on the day's schedule was "Elderly." Scott began walking toward the bus without the need for a cane or walker. Scott stepped up on the first step of the bus when Padgett offered to take her bag to assist in her boarding. Scott handed Padgett the bag and took a second step up toward the bus and then fell backward, hitting her head on the pavement and causing serious injury.

¶6. Scott sued Singing River claiming its negligence was the cause of her injuries. Her complaint alleged that Singing River was vicariously liable for Padgett's failure to park the bus in the correct location, failure to assist and secure Scott into the vehicle, and failure to

take reasonable steps to ensure Scott's safety.[3]  A one-day bench trial took place on February 2, 2021, in the Jackson County Circuit Court.  The court rendered its judgment in March 2021 in favor of Singing River, specifically finding that Singing River was not protected by discretionary function immunity, but it nonetheless was not liable under a negligence theory.  Yarborough filed a motion for judgment notwithstanding the verdict or alternatively for a new trial on March 25, 2021.  Then, on April 21, 2021, Yarborough filed a motion for recusal.  A hearing was held on both motions, and both were subsequently denied.  Yarborough appealed.

## DISCUSSION

¶7.    Yarborough claims the circuit court erred in multiple ways, including: (1) the court failed to apply the common carrier or for-hire carrier's highest standard to Singing River; (2) the court was manifestly wrong in its judgment due to the overwhelming weight of the evidence; (3) the court applied the wrong legal standard in finding an expert's testimony called for strict liability; (4) the court erred by ignoring evidence of Padgett's past behavior; (5) the court erred by finding that the injury was the result of an unavoidable accident; and (6) the court was biased against Yarborough and prejudged the case.

¶8.    "When a trial judge sits without a jury, this Court will not disturb his factual

---

[3] In addition, the complaint alleged direct claims against Singing River for negligent hiring, training, supervision, and retention of its drivers; for not having proper protocols and safety measures; and for not following the proper protocols and safety measures.  These claims were subsequently dismissed at trial and were not appealed.

determinations where there is substantial evidence in the record to support those findings." *In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 835 (¶9) (Miss. 2015) (quoting *Transocean Enter. Inc. v. Ingalls Shipbuilding Inc.*, 33 So. 3d 459, 462 (Miss. 2010)). "We will not reverse the trial court's findings of fact unless [they are] manifestly wrong or clearly erroneous." *Id.* (citing *Puckett v. Stuckey*, 633 So. 2d 978, 982 (Miss. 1993)). We review errors of law de novo. *City of Jackson v. Perry*, 764 So. 2d 373, 376 (¶9) (Miss. 2000).

### (1)    Negligence

¶9.    Yarborough claims that the court erred by applying a simple negligence standard to Singing River. She argues the court should have applied the "highest standard" as in cases of a common carrier or carrier of passengers for hire.

¶10.    "The rule which is agreed upon and established by all the cases is that a common carrier by motor but owes the duty to its passengers to exercise the highest degree of care and precaution for their safety that is consistent with the practical conduct of its business." *Lambert v. Lott*, 222 So. 2d 816, 818 (Miss. 1969) (quoting *Teche Lines Inc. v. Keyes*, 187 Miss. 780, 193 So. 620, 621 (1940)). The parties on appeal disagree on whether courts apply the standard of care for common carriers or carriers of passengers for hire. The courts have addressed the designation:

> To constitute a carrier a common carrier, he must hold himself out as engaged in public service for all persons indifferently, so that he would be liable for refusal without excuse, to carry for all who might apply.

5

Where one engaged in the hauling business invites all to employ him, but reserves to himself the right of accepting or rejecting their offers of goods for carriage, depending upon the attractiveness or advantage of the particular offer, and not by his ability or inability to carry, having regard for his other engagements, he is not a common carrier. *Belfast Ropework Co. v. Bushell*, [1918] 1 King's Bench 210, 8 B.R.C. 783.

. . . .

Referring again to *Belfast Ropework Co. v. Bushell*, *supra*, it was further stated that it is optional with this carrier whether he will accept or reject any business that is offered him. The fundamental distinction is that a private carrier enters into a contract with each of his customers and assumes no obligation to carry for any other; while the common carrier undertakes to carry for all persons indifferently. Further that the mere fact that a person or corporation transporting goods on the public highways invites all and sundry persons to employ him does not render him a common carrier as regards liability for loss or damage to the goods, if he reserves the right of accepting or rejecting their offers of goods for carriage, whether his vehicles are full or empty, being guided in his decision by the attractiveness or otherwise of the particular offer and not by his ability to carry.

*Erwin Mills Inc. v. Williams*, 238 Miss. 335, 339-40, 118 So. 2d 339, 341 (1960). This Court's decision in *Boyd Tunica Inc. v. Premier Transportation Services Inc.*, 30 So. 3d 1242 (Miss. Ct. App. 2010), expanded this standard to carriers of passengers for hire.

¶11. *Boyd* involved an injury that occurred on a twenty-five-passenger shuttle bus owned and operated by Premier Transport Services Inc., which had contracted with Boyd Tunica, Inc. to transport customers to and from its casinos. *Id.* at 1245 (¶1). A passenger was injured when the shuttle bus suddenly braked to avoid hitting another vehicle. *Id.* at (¶3). Relying on *Goodwin v. Gulf Transport Co.*, 453 So. 2d 1035, 1036 (Miss. 1984), where our supreme court stated that a carrier of passengers for hire is held to the highest standard of care, we

6

held that a common carrier and a carrier of passengers for hire are two distinct classifications, but they both are held to the same highest standard of care.[4] *Boyd*, 30 So. 3d at 1250-51 (¶24). Therefore, whether Singing River is classified as a common carrier or carrier of passengers for hire does not matter because the standard of care is the same.

¶12. *Goodwin* is instructive as to a framework for applying the "highest standard" in common-carrier cases. The plaintiff there was walking off a public bus when she slipped on a "red liquid" and fell, sustaining injuries. *Goodwin*, 453 So. 2d at 1035-36. The plaintiff argued that because the carrier, Gulf Transport, was a common carrier, she was entitled to a presumption of negligence and only needed to establish a prima facie case that (1) she was a passenger on the Gulf Transport vehicle; (2) the accident occurred; and (3) she was injured. *Id.* at 1036. The supreme court rejected this argument, stating that the presumption of negligence was reserved for railroad cases[5] and that "regarding injuries on public buses, [t]he burden of proof is upon [the] plaintiff to show by a preponderance of the evidence that the defendant was guilty of negligence." *Id.* (internal quotation marks omitted) (quoting *Gates v. Greyhound Corp.*, 197 F. Supp. 341, 344-45 (S.D. Miss. 1960)). Accordingly, the supreme court used the standards applicable to invitees in slip-and-fall cases to evaluate the plaintiff's

---

[4] It is unclear whether the supreme court in *Goodwin* intended to distinguish between a "common carrier" and a "carrier of passengers for hire." The opinion seems to use both interchangeably. *See Goodwin*, 453 So. 2d at 1036. However, our more recent opinion in *Boyd* maintained this distinction. *Boyd*, 30 So. 3d at 1250-51 (¶24).

[5] *See Tri-State Transit Co. of La. v. Mondy*, 194 Miss. 714, 725-26, 12 So. 2d 920, 922 (1943); *Chicago St. Louis & New Orleans R.R. Co. v. Trotter*, 60 Miss. 442, 446 (1882).

claims. *Id.* at 1037.

¶13.    We follow this rationale in the instant case. Although this case is not in the slip-and-fall category, the claims can be examined under the standard of care for an invitee.

¶14.    The duty of care owed to an invitee is to keep the premises reasonably safe and to warn of any hidden dangerous conditions. *Venture Inc. v. Harris*, 307 So. 3d 427, 433 (¶22) (Miss. 2020). "[M]ere proof of occurrence of an accident is insufficient to establish negligence." *Id.* (quoting *Patterson v. T.L. Wallace Constr. Inc.*, 133 So. 3d 325, 332 (¶21) (Miss. 2013)).

¶15.    First, there was no hidden dangerous condition in this case. There was an argument that the steps leading up to the bus were dangerous because the location of the bus added "four to seven" inches from the curb to the first bus step. However, the requirements for the invitee test are not met, as this condition was not hidden. Scott would have been aware of the issue, as the pavement had been elevated for "[q]uite a while."

¶16.    Next, there was no evidence that Padgett or Singing River failed to keep the bus steps reasonably safe. No evidence suggested the bus steps had any issues. Padgett followed all the policies and procedures of Singing River. He was able to witness Scott walking toward the bus with no need for a cane or walker, and this fact was corroborated by Yarborough's own testimony. Furthermore, there was no evidence that Padgett was alerted to any dangerous condition because of Scott's allegedly impaired mobility.

¶17.    Yarborough, with the expert testimony of Joseph Rubino, an expert in medical

transportation, argues that Padgett had a duty to walk outside the vehicle and stand behind Scott as she walked up. The trial court correctly determined that this requirement went beyond the reasonable care that was owed in this case. Singing River owed Scott the "highest degree of care and precaution for [her] safety that is consistent with the practical conduct of its business." *Boyd*, 30 So. 3d at 1250 (citing *Lambert*, 222 So. 2d at 818). Just because people are under the "highest duty" of care applicable in common-carrier cases does not mean they are the "absolute insurers" of their passengers or held strictly liable for their passenger's injuries. *See Goodwin*, 453 So. 2d at 1036 ("On the other hand, Gulf Transport does not by virtue of its contract of carriage or of the positive law of the state, become an insurer of its passengers' safety."); *see also Miss. City Lines v. Bullock*, 194 Miss. 630, 13 So. 2d 34, 38 (1943) (finding a common-carrier bus company did not have a duty to warn passengers of the danger of approaching vehicles). Padgett, acting as a bus driver for elderly or disabled passengers, had a duty to provide the necessary assistance required by each of his passengers. For some people, that duty required him to step outside to use the lift function of the bus. For Scott, an ambulatory passenger with no "Lift" or "Wheel Chair" designation, Padgett was only required to observe her, ensure she was walking steadily, and safely drive her to her destination. While Padgett had often walked outside his vehicle to help Scott in the past, he was under no obligation to do so, especially considering that Scott was not visibly impaired while walking to the bus.

¶18.    In the trial court's order following Yarborough's motion for judgment notwithstanding

9

the verdict, the court stated that it "considered the Plaintiff's interpretation of the heightened duty in its analysis and found it to be not reasonable under the circumstances and not supported by the evidence adduced at trial." The court stated that both Yarborough and Singing River agreed that the degree of care owed to its passengers is the duty to provide **assistance as needed**, but they disagreed as to what that meant. Rubino's testimony and Yarborough's position was that "assistance as needed" meant Padgett was required to get off the bus and assist passengers curb-to-curb every time they boarded, regardless of whether the passenger asked for assistance or objectively appeared to need assistance. The court noted that no Mississippi caselaw recognized Rubino's supposed duty of care. Furthermore, the court quoted *Goodwin*, explaining that Singing River was not "an insurer of its passengers' safety." *Goodwin*, 453 So. 2d at 1036. The court was not persuaded by Rubino's testimony and found his theory on the highest standard of care to be unreasonable in this case. We agree with the court's analysis and judgment.

### (2) Weight of the Evidence

¶19. Yarborough argues that the court's ruling was manifestly wrong because it was against the overwhelming weight of the evidence. In particular, she argues three topics to support this issue: the *Stewart* cases, certain admissions by Singing River, and the testimony of Dr. Stephen Johns.

### (a) *Stewart* Cases

¶20. Yarborough argues that *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So.

10

2d 703 (Miss. 2005) (*Stewart I*), is factually on point with the present case and proves the trial court's judgment was against the weight of the evidence.[6]

¶21.    In *Stewart I*, the plaintiff was an elderly woman who had suffered a stroke, leaving her paralyzed on the right side of her body and causing her to attend an adult daycare center. *Stewart I*, 908 So. 2d at 705 (¶2).  The daycare was run by the University of Mississippi Medical Center (UMMC) while it was under a contract with the Central Mississippi Planning and Development District Area Agency on Aging (CMPDD).  *Id.* at (¶3).  The City of Jackson was also under a contract with CMPDD to provide transportation "to and from community resources for the purpose of obtaining needed services and goals," of which the daycare was included.  *Id.* at 706 (¶6).  On the day of the injury, Doris Spiller, an employee of the City,  was substituting for the regular van driver and picked up the plaintiff.  *Id.* at (¶8).  Once they arrived, Spiller helped the plaintiff out of the vehicle and into the parking lot, leaving her alone to assist the next passenger.  *Id.* at (¶9).  The plaintiff, who required the use of a leg brace and cane to walk, began walking by herself to the daycare center and fell over, sustaining injury.  *Id.*

¶22.    The plaintiff sued Spiller, UMMC, and the City of Jackson.  *Id.* at 707 (¶14). The trial court found that (1) the City was liable for its failure to "train its drivers and to ensure the

---

[6] This case has a substantial procedural history, and different opinions are cited throughout Yarborough's brief.  *Stewart ex rel. Womack v. City of Jackson* (*Stewart II*), 804 So. 2d 1041 (Miss. 2002), was the appeal from the first summary judgment in the case. *Stewart I* is the opinion from the appeal in the case after it was remanded.

safety of its passengers"; (2) the City should have provided Spiller with special training in assisting and handling elderly passengers; (3) UMMC was liable for its failure to have personnel available in the parking lot to assist the passengers; and (4) the plaintiff was a third-party beneficiary of the contract between the City and CMPDD. *Id.* at (¶17). The supreme court reversed the judgment against UMMC, finding that the transportation was not an aspect of their contract, but the court upheld the judgment against the City, remanding the case only to ensure the damages complied with the Mississippi Tort Claims Act's statutory limit. *Id.* at 716 (¶67).

¶23. While *Stewart* and the present case have factual similarities, they are distinguishable. In her brief, Yarborough highlights that the buses transported "elderly, ambulatory passengers" to the daycare, comparing the passengers of both cases. While we do not know what criteria the parties in *Stewart* used to classify someone as ambulatory, it is obvious that the two plaintiffs in this comparison are distinguishable. *Stewart*'s plaintiff suffered from partial paralysis from a stroke that required her to use a brace and cane to walk, while Scott only rarely needed the use of a cane. *Id.* at 705 (¶2); *Stewart II*, 804 So. 2d at 1045 (¶3). The testimony from Yarborough confirmed that Scott was able to walk fine most days. It is unlikely that the plaintiff in the *Stewart* cases would have been considered ambulatory under Singing River's policy because of both the nature of her injury and required use of a cane.

¶24. Yarborough attempts to draw a bright line rule for cases involving medical transport buses. Yet she provides no statute or holding from any case that imposes such a duty. The

12

*Stewart* cases are factually similar to our current case, but they are not identical. The supreme court's opinions in both *Stewart* cases prescribed no such duty or rule. It affirmed the trial court's judgment as to liability, but its analysis in the opinion dealt with the claims for breach of contract and proof of damages. We disagree that the *Stewart* cases provide "absolute proof" that the trial court was manifestly wrong in its decision.

### (b) Singing River Admissions

¶25. Yarborough argues that certain admissions by Singing River and its employees prove that the trial court's judgment was against the overwhelming evidence. Much of the listed admissions presented by Yarborough address the concept that people's falls, especially among elderly passengers, are foreseeable. Yarborough then attempts to show that Singing River admitted Scott was "disabled" by referencing the Dailey Ridership Forms and testimony from Singing River's representative, Carolyn Morrow. Yarborough's attempts to do so are misleading. While the section of the deposition included in Yarborough's brief seems to suggest a mutual understanding of the word "disabled," Morrow made it clear in her later testimony that a passenger being marked as disabled does not necessarily mean that the passenger has trouble walking. The overwhelming evidence presented at trial was that Scott had no trouble walking on the day of the incident. Therefore, we do not find these alleged admissions as proof of manifest error.

### (c) Dr. Stephen Johns' Testimony

¶26. Dr. Stephen Johns was a doctor who examined and treated Scott in January 2019.

13

Yarborough alleges that the trial court failed to fully consider Dr. Johns' testimony in its opinion. However, the trial judge stated on the record that she fully read and considered the testimony. Yarborough suggests the judge's statement is not true by claiming that the judge "parroted" back the defense's arguments rather than agreeing with Dr. Johns. However, the trial judge provided several reasons for why the deposition testimony was unpersuasive to her. Dr. Johns had admitted during his deposition that he had not reviewed all of Scott's medical records, he had not assessed or treated Scott prior to her fall, and he was not able to comment on her ability to ambulate on the day of the injury.

¶27. The essence of Dr. Johns' testimony was that Scott had several chronic medical conditions that could negatively affect her ability to walk and that she maintained these conditions before and after the injury. Given that Dr. Johns could not comment on the day in question, and the majority of evidence suggests that Scott was walking without issues on that day, we find no manifest error in the trial judge's findings in relation to this evidence. Further, we find no evidence that suggests that the trial judge did not read and consider the deposition testimony.

### (3) Rubino's Expert Testimony

¶28. Yarborough argues that the trial court misinterpreted Rubino's testimony. The relevant part of the order follows:

> Rubino's testimony set out a scenario that would require this Court to hold SRHS to the much higher standard of strict liability. Rubino stated that if the driver was not behind or beside the rider to stop a fall, he failed to provide assistance as needed. Thus, if someone falls, the driver is at fault, regardless

14

of the circumstances. That is not the proper standard in a simple negligence case. The driver was required to use reasonable care in determining whether she needed assistance and providing same.

Contrary to Yarborough's assertion, the trial court did not find that Rubino was articulating a strict liability standard of care. Rather, the court compared Rubino's testimony to the duty of strict liability, explaining that Rubino's supposedly correct duty was not the correct one to apply in this case. Our caselaw is clear that the common carrier's highest duty is not the same as being the insurer of their passengers. *Goodwin*, 453 So. 2d at 1036. This issue is without merit.

### (4)    Evidence of Padgett's Prior Tardiness

¶29.    Yarborough argues that the trial court erred by refusing to allow testimony regarding evidence of Padgett's habit of being late. During the hearing, the trial judge limited much of the testimony to the day in question. Yarborough argues that this evidence was relevant because it supposedly proved that Scott was "in a hurry" on the day of the incident and that it caused Padgett to park on the street rather than in the driveway.

¶30.    There was no compelling evidence presented at trial that Padgett was late on the day in question. Furthermore, even if Padgett had been late, nothing shows it caused Scott to hurry to the bus. Yarborough's testimony at trial indicated that Scott had complained about Padgett's tardiness in the past, yet no evidence showed that Scott behaved any differently depending on this alleged tardiness. Even if we assume that Scott was in a hurry due to Padgett's tardiness, it is a stretch to suggest that this tardiness was the proximate cause of her

15

injuries.

¶31.    The same reasoning applies to the allegation that Padgett's tardiness caused him to park on the street instead of in the driveway.  Padgett testified that he usually parks on the street if Scott is waiting on the front porch, and he would only park in the driveway if she was inside the house.  While this testimony was disputed by Yarborough, who claimed she had never seen Padgett park on the street, the relevancy of this testimony as it relates to the tardiness is unclear.  It is undisputed that Padgett parked on the street on the day in question, so whether he had been late in the past was irrelevant.

### (5)    Unavoidable Accident

¶32.    Yarborough argues that the trial court erred by finding that Scott's injury was the result of an unavoidable accident.  However, the trial court never made that finding.  At the post-trial motions hearing, the trial judge said the following:

> Well, to begin with, don't interpret my ruling as saying I believe that your client was at fault.  That is certainly not what my ruling was, and that's not what it was meant to be.  **Sometimes accidents happen, and it's nobody's fault**.  And just because somebody's not found to be at fault doesn't mean I'm finding fault on the part of your client.  I certainly would never do that.

(Emphasis added).  This statement, "Sometimes accidents happen, and it's nobody's fault," does not mean the same thing as the accident was unavoidable.  Our caselaw defines an unavoidable accident as "an occurrence which was not intended, and, which, under all the circumstances, could not have been foreseen or prevented by the exercise of reasonable precautions."  *Buford v. Riverboat Corp. of Mississippi-Vicksburg*, 756 So. 2d 765, 770-71

16

(¶29) (Miss. 2000) (quoting William L. Prosser, The Law of Torts § 29, at 140 (4th ed. 1971)). When read in context, it is obvious that the true meaning of the judge's statement was that not all accidents have a liable party. The judge was commenting that neither Scott nor Padgett were negligent, i.e., neither was breaching an established duty.

### (6) Bias Against Yarborough

¶33. Yarborough argues that the trial judge was biased against her and prejudged the case, by finding that Singing River was not liable for Scott's injuries. The justification for this contention stems from a single comment that the judge made while walking down from the bench during a recess. While stepping down the stairs, the judge allegedly said, "I think I might need some assistance," followed by, "I'm just kidding." Yarborough also suggests that several evidentiary rulings against her favor and the final judgment ultimately support the claim of bias.

¶34. "The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application." *Tubwell v. Grant*, 760 So. 2d 687, 689 (¶7) (Miss. 2000) (quoting *Collins v. Joshi*, 611 So. 2d 898, 902 (Miss. 1992)). If a reasonable person, knowing all the circumstances, would question a judge's impartiality, the judge must recuse himself. *Doe v. Stegall*, 900 So. 2d 357, 360 (¶10) (Miss. 2004). However, a judge is presumed to be qualified and unbiased, and the party moving for recusal bears the burden of proving "reasonable doubt" to overcome the presumption. *Id.*

17

¶35. Uniform Civil Rule of Circuit and County Court Practice 1.15 governs the procedure for seeking recusal: a party is required to submit a motion for recusal "within 30 days after the filing party could reasonably discover the facts underlying the grounds asserted." UCRCCC 1.15. Furthermore, the filing party is required to file a supporting affidavit that sets forth the factual basis of the claim, a statement that the motion was made in good faith, and a declaration that the undersigned truly believes the underlying facts are true. *Id.*

¶36. The trial took place on February 2, 2021, and the judgment was entered on March 15, 2021. Yarborough's first objections to the alleged bias came in her motion for judgment notwithstanding the verdict or a new trial on March 25, 2021, where she discussed the underlying facts of the claim. The motion for recusal was not filed until April 21, 2021—over seventy-eight days after the trial and well after the judgment was entered. In addition, the accompanying affidavit was not filed until May 4, 2021. The supreme court has stated that it is unacceptable to take one's chances with a judge who has a basis for recusal and file the motion only after an unfavorable verdict. *Buchanan v. Buchanan*, 587 So. 2d 892, 897 (Miss. 1991). Yarborough's motion failed to meet the required time requirement and is therefore waived.

¶37. However, to allay misinterpretations, we will also address the claim on its merits. Yarborough claims that the joke made by the trial judge "shows an extreme level of disrespect for the Plaintiff, and amounted to mocking a disabled, now deceased person." Yarborough also argued that the trial judge "seemed to only accept evidence from both

experts that supported the Defendant and rejected any evidence or testimony that showed the Defendant was negligent." Yarborough cites several cases that she claims support her argument.

¶38. She quotes *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 297 (5th Cir. 1977), where the Fifth Circuit Court of Appeals stated, "[W]e find slight, if any, justification in the record for the judge's sarcasm, his frequent interruptions and his antagonistic comments in the jury's presence." Yet that case involved a judge who was outwardly hostile to the defense, openly ridiculed them, and constantly interrupted them throughout the trial. *Id.* at 295-97. In comparison, Yarborough points to one comment which—even if taken as a comment mocking the plaintiff—is a far cry from the conduct seen in *Candelaria-Gonzalez*.

¶39. Yarborough cites *McGee v. State*, 820 So. 2d 700 (Miss. Ct. App. 2000), to show an example of a judge prejudging a case. The relevant exchange follows:

> BY THE COURT: I tell you, he shot this fellow. Before he shot him he said, I don't mind - - the guy wanted to play fair. He took off his rings and his watch and wanted to play fair. And this one said, I don't mind a murder wrap and shot him in the arm and then he shot him two times in the back. So, along about the middle of November, at some date to be set by the court administrator, at a later time, we'll have a bond hearing.
>
> BY MR. MILNER: Your Honor, is the Court stating that that is the Court's position as to what this man said as a matter of fact?
>
> BY THE COURT: This is what has been reported to me. To shoot somebody two times in the back is not self-defense.

*Id.* at 710 (¶31). The defendant filed a motion to recuse, which was initially denied by the

judge. This Court reversed the order, finding that the judge had prejudged the case. *Id.* at 710-11 (¶¶32-33). The judge's comments came during an arraignment before any evidence had been heard and went directly against the defense's main legal theory. *Id.* The comment in the present case was made during trial and did not involve any legal claim like in *McGee*.

¶40. Finally, the trial judge in the instant case addressed the allegations during the post-trial motions hearing. She stated that she did not direct the comment to the plaintiff; it was directed toward herself because she was having back pain. She explained that she wears a TENS (transcutaneous electrical nerve stimulation) unit on her back to help with her pain. Further, she stated that she would never make fun of a disabled person because her own son is disabled, and she has witnessed people mock him first-hand. We do not see how an objective person, given all the circumstances, would find the judge to be biased. Therefore, we find this issue is without merit.

## CONCLUSION

¶41. Finding no error, we affirm the judgment of the circuit court.

¶42. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**